**In re MIDWAY AIRLINES, INC.,
Midway Aircraft Engineering,
Inc., Debtors.**

**Sheldon L. SOLOW, Trustee, not individually, but as Trustee for the estate of Midway Airlines, Inc. and Midway Aircraft Engineering, Inc., Plaintiff,**

**v.**

**AMERICAN AIRLINES, INC., Defendant.**

**Bankruptcy Nos. 91 B 06449, 91 B 06451.
Adversary No. 96 A 01032.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

May 7, 1998.

Charles P. Schulman, Tracy L. Treger, Richard G. Smolev, Sachnoff & Weaver, Ltd., Chicago, IL, for Plaintiff.

Steven L. Bashwiner, Ronald S. Betman, Katten Muchin & Zavis, Chicago, IL, for Defendant.

Sheldon L. Solow, Sachnoff & Weaver, Ltd., Chicago, IL, Trustee.

## MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

### PROLOGUE

This matter comes before the Court on the Complaint of Sheldon L. Solow as trustee (the "Trustee") of the Debtors' bankruptcy estates objecting to the proofs of claim and requests for payment of administrative expenses of American Airlines, Inc. ("American") and on the affirmative defenses thereto by American, as well as the motion of American to strike portions of Exhibit A to the Trustee's post-trial memorandum and all references thereto in the post-trial submissions. As William Shakespeare noted in *Henry VI*, equally applicable to the resolution of disputed interline air carrier accounts: "thou hast built a paper-mill!"

### SUMMARY OF DECISION

The Trustee filed this adversary proceeding against American thereby objecting to American's proofs of claim and requests for payment of administrative expenses (the "Claims"). Pursuant to Count I of the Complaint, the Trustee objects to American's Claims on several grounds: (1) American has failed to demonstrate the specific dollar amount it is entitled to on each component of its Claims; (2) the amounts enumerated in the Claims were not actual or necessary costs of preserving the Estate; (3) the amounts are inaccurate; (4) the expenses did not confer a benefit to the Estate; and (5) American's expenses did not arise out of a transaction with Midway.

The Court holds that American demonstrated that its Claims are entitled to administrative priority status under 11 U.S.C. §§ 503(b)(1)(A) and 507(a)(1). With respect to the passenger transportation services component of its Claims, however, American has failed to meet its burden of proof on the precise and correct amount that the Court should allow, inasmuch as neither party has completely reviewed and audited the thousands of flight coupons and related documents underlying such component and the Court is in no position to do so. Hence, the Court sustains the Trustee's objections in this regard.

Accordingly, the Court affords American and the Trustee 90 days hereafter to review, on an expedited basis, the underlying documentation supporting the Claims to attempt to determine the precise and proper amount for the passenger transportation services. American and the Trustee may employ procedures similar to those under the Bilateral Agreement and the Airlines Clearing House Manual of Procedure. By employing the Airlines Clearing House procedures to review the documents, the parties, who are both familiar with those procedures, will be able to keep costs to a minimum and hopefully will be able to agree upon most of the correct amounts for the specific items.

If there remains a dispute regarding a specific item or items, then the Court will employ the assistance of an expert under Federal Rule of Evidence 706(a) to help aid in its determination of the properly allowable amount. Such expert shall be entitled to reasonable compensation to be determined by the Court, and to be paid by the parties in equal proportion under Federal Rule of Evidence 706(b). The parties will on or before 120 days hereafter, each submit one or two nominations for appointment of such expert attaching a letter from each nominee setting forth his or her qualifications, a description of the work to be prepared, the fee basis on which such person will serve, and a commitment to file a report by December 31, 1998. Unless the parties agree on the person to be appointed, the Court will appoint an expert

witness of its own selection. The expert will file a report with copies to the parties by a date certain to be selected by the Court, and then submit to deposition should either party desire such. The expert may then be called to testify by the Court or either party at further hearing pursuant to Federal Rule of Evidence 706(c).

The Court further holds that the non-transportation services and ground handling services components of the Claims in the amount of $337,910.97 and $58,677.37 respectively are entitled to administrative priority status under §§ 503(b)(1)(A) and 507(a)(1). Additionally, the Court holds that the Universal Air Travel Plan chargeback component of American's Claims in the sum of $26,098.82 is entitled to administrative priority status under §§ 503(b)(1)(A) and 507(a)(1). The Court overrules the Trustee's objections to these components of the Claims.

Under Count II of the Complaint, the Trustee seeks a setoff of the amount allowed or granted administrative priority to American against the amount allegedly due and owing Midway. The Court holds that Count II of the Complaint is time barred under 11 U.S.C. § 546(a) and sustains American's affirmative defense in this respect.

Count III of the Complaint asserts a breach of contract claim against American for an alleged breach of an agreement between the parties. The Court holds that the Trustee failed to support his claim by a preponderance of the evidence that American breached the Bilateral Agreement by submitting improperly billed invoices for the period April 1, 1991 through November 13, 1991.

Count IV[1] of the Complaint seeks an accounting of the invoices, receipts, disbursements, services and operations upon which American's Claims are premised. The Court holds that the Trustee has not adequately demonstrated the necessity for an accounting of the interline charges and credits between Midway and American. The Court exercises its discretion by not ordering a full and complete accounting in light of the disposition ordered under Count I.

Lastly, in Count V[2] of the Complaint, the Trustee requests that American turn over the sum of $835,000.00 under 11 U.S.C. § 542 as the result of monies American received for which it is not entitled to receive administrative priority. The Court reserves ruling on this matter pending the disposition ordered in Count I.

American asserts several affirmative defenses to the Complaint: (1) Counts II–V of the Complaint are barred by the statute of limitations under 11 U.S.C. § 546(a); (2) the objections to the Claims are barred by the doctrines of waiver and estoppel; (3) to allow the Midway Estate to retain the benefit of the service without compensation to American would be inequitable and unjust; (4) to the extent American owes monies to Midway, all amounts owed should be offset against Midway's debt to American based on the doctrines of recoupment and setoff; and (5) American is an assignee of the Midway passengers' claims, and in the event the agreement between Midway and American does not govern its Claims, American's Claims are entitled to the same priority as those of the Midway passengers.

The Court sustains American's first affirmative defense, in part, and holds that Count II of the Complaint is barred under 11 U.S.C. § 546. The Court denies this affirmative defense as to the other Counts. In addition, the Court denies the defense that the Trustee's objections are barred by the doctrines of waiver and estoppel. The Court holds that Count V of the Complaint, which seeks turnover of property of Midway's Estate, is not barred under the doctrine of laches.

Moreover, the Court holds that American's affirmative defense that to allow the Midway Estate to retain the benefit of the services without compensation to American would be unjust and inequitable is moot insofar as the Court has determined that American's Claims are entitled to administrative priority

---

1. The Trustee mistakenly refers to this Count as Count V rather than the numerically correct denomination IV.

2. Because of the error in the numbering of Count IV, this Count also has been numbered incorrectly as Count VI.

status, albeit in an undetermined and unproven total sum.

Additionally, the Court is unable to determine at this time whether American owes monies to Midway, and thus cannot determine if an amount should be offset against Midway's debt to American based on the doctrine of setoff. The doctrine of recoupment is inapplicable, and thus this affirmative defense is denied.

Furthermore, American's last affirmative defense regarding its Claims being entitled to the same priority as those of the Midway passengers in the event the Bilateral Agreement does not govern, is denied as unsupported.

Both parties moved for directed findings in their favor pursuant to Federal Rule of Bankruptcy Procedure 7052, which incorporates by reference Federal Rule of Civil Procedure 52(c). The Court reserved ruling on those motions. Both motions are hereby denied based on the Court's detailed findings of fact and conclusions of law.

Finally, American filed a motion to strike portions of Exhibit A to the Trustee's post-trial memorandum and the references thereto in its post-trial submissions. The Court grants American's motion to strike certain portions of Exhibit A to the Trustee's post-trial memorandum. The Court will not consider the handwritten calculations of the Trustee's agents or attorneys as these notations were never identified on the Trustee's exhibit list, were not authenticated by any witness, and were not offered or admitted into evidence. The Court attaches no independent significance to the highlighted portions of that exhibit, and will not consider same as substantive evidence.

### JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain these matters pursuant to 28 U.S.C. § 1334 and General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. These matters constitute core proceedings under 28 U.S.C.

§ 157(b)(2)(B), (C) and (O). Venue is proper pursuant to 28 U.S.C. § 1409(a).

All findings of fact contained herein that are deemed to be conclusions of law shall be additional conclusions of law, and all conclusions of law herein that are deemed to be findings of fact shall be additional findings of fact. *See In re Piper's Alley Co.,* 69 B.R. 382, 384 (N.D.Ill.1987).

The function of the Court in a bench trial such as this, where the Court acts as the fact finder, is to resolve conflicting evidence by determining the credibility of witnesses, the weight to be attached to the testimony and the inferences to be drawn from the evidence. *See generally S.T.S. Int'l, Ltd. v. Laurel Sea Transport, Ltd.,* 932 F.2d 437, 440 (5th Cir.1991); *Scandia Down Corp. v. Euroquilt, Inc.,* 772 F.2d 1423, 1428 (7th Cir.1985), *cert. denied,* 475 U.S. 1147, 106 S.Ct. 1801, 90 L.Ed.2d 346 (1986).

Based on the proposed findings and conclusions submitted by the Trustee and American, the testimony of the witnesses at trial, and the exhibits admitted into evidence, the Court makes the following findings of fact and conclusions of law.

### THE UNDERLYING MATERIAL BACKGROUND FACTS FOR ALL COUNTS OF THE COMPLAINT AND AMERICAN'S AFFIRMATIVE DEFENSES

#### A. The Parties

1. Midway Airlines, Inc., ("Midway"), Midway Airlines (1987), Inc. ("Commuter") and Midway Aircraft Engineering, Inc., all related corporations, collectively referred to at times as Midway, filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code on March 25, 1991. [Joint Pretrial Statement, Uncontested Facts, ¶ 5].

2. All Midway corporations ceased active flight operations as of midnight on November 13, 1991. [9/8/97 Tr. at 78:4–7 (Peters); [3] Joint Pretrial Statement, Uncontested Facts, ¶ 7].

---

**3.** All references to the trial transcript will hereinafter be as follows: [9/-/97 (Date) Tr. (Transcript) at Page Number:Line Number(s) (Name of Witness) ].

3. Midway's case was converted to Chapter 7 on November 27, 1991. [Joint Pretrial Statement, Uncontested Facts, ¶ 6].

4. Commuter's case was converted to Chapter 7 on March 9, 1992.

5. The Trustee is the duly appointed and acting Trustee of the bankruptcy Estate of Midway. He was appointed on November 27, 1991. [Joint Pretrial Statement, Uncontested Facts, ¶ 4]. He was subsequently appointed as Trustee for the bankruptcy Estate of Commuter.

6. American is an air carrier engaged in interstate, overseas and foreign air transportation of persons, property and mail with its principal place of business in Fort Worth, Texas.

### B. *The Proofs of Claim*

7. On April 30, 1992, American filed and served proofs of claim and requests for payment of administrative expenses in the Midway bankruptcy case in the following amounts: $16,293,878.29 for transportation of passengers; $556,644.52 for non-transportation services; $58,677.37 for ground handling services; and $26,098.82 for Universal Air Travel Plan chargebacks, plus post-petition interest, attorneys' fees and costs in an unliquidated amount (collectively "the Claims"). [Joint Pretrial Statement, Uncontested Facts, ¶ 8; American's Exhibit Nos. 3, 4 and 5]. The Claims seek recovery as administrative expenses entitled to priority under 11 U.S.C. §§ 503(b)(1)(A) and 507(a)(1). [Joint Pretrial Statement, Uncontested Facts, ¶ 9].

8. On August 29, 1997, American filed a second amended proof of claim and request for payment of administrative expenses relating solely to the transportation of passengers

in the amount of $15,529,260.81, plus post-petition interest, attorneys' fees and costs in an unliquidated amount. [American's Exhibit No. 2].

9. The Claims consist of unpaid amounts allegedly due to American for postpetition services provided to Midway as follows:

Passenger Transportation

| | |
|---|---|
| November 1991 | $ 7,145,058.39 |
| December 1991 | 5,671,336.31 |
| January 1992 | 2,060,276.62 |
| February 1992 | 348,573.58 |
| March 1992 | 142,908.66 |
| April 1992 | 161,107.25 |
| Subtotal | $15,529,260.81 |
| Non–Transportation Services | $ 337,910.97[4] |
| Ground Handling Services | 58,677.37 |
| UATP Chargebacks | 26,098.82 |
| Total | $15,925,849.15[5] |

10. The second amended proof of claim seeks recovery as administrative expenses entitled to priority under 11 U.S.C. §§ 503(b)(1)(A) and 507(a)(1).[6]

### C. *Industry Interline Agreements*

11. Over the years, the airline industry has developed an intricate network of agreements that govern virtually every aspect of air travel and airline operations. [American's Exhibit No. 45, ¶ 19; 9/8/97 Tr. at 58:18–65:4 (Peters)].

12. Through the various industry agreements, air carriers, suppliers, ground personnel, airport authorities, travel agents and others cooperate to facilitate such activities as making reservations and transferring passengers, baggage and mail between airlines. [American's Exhibit No. 45, ¶ 20; 9/8/97 Tr. at 61:14–24 (Peters)].

---

**4.** This represents a reduction from the original amount sought.

**5.** This final figure represents the amount American seeks in its Post–Trial Brief. *See* American's Post–Trial Brief at p. 46. However, these components do not calculate to this amount. Rather, they total $15,951,947.97. The Court is unable, after numerous attempts, to determine and calculate the final total amount of American's Claims. Thus, this discrepancy in the final amount requested by American represents yet another reason for the Court's decision that

American has failed to meet its burden of proof on the correct and precise amount of the Claims. The parties should bear in mind what Samuel Johnson said to Mrs. Thrale in another time and context: "when you are declaiming, declaim; and when you are calculating, calculate."

**6.** American removed approximately $88,000.00 from its Claims constituting alleged improper billing quantified by the Trustee prior to the start of trial. [9/11/97 Tr. at 77:19–21 (Nelson); American's Exhibit No. 2].

13. It is typical in the airline industry for airlines to have contractual relationships with other airlines under which each airline agrees to provide the aforementioned goods and services to the other on a regular basis in exchange for payment. These services include flying passengers initially holding tickets on the other airline, providing aircraft maintenance, the transportation and handling of baggage, or facilitating catering or other services to the other airline. [9/8/97 Tr. at 58:18–59:3 (Peters)]. Without these agreements, buying tickets and reserving seats would be more difficult, baggage could not be checked through interline connecting flights and planes would not be refueled at end points on a carrier's lines. [American's Exhibit No. 45, ¶ 20; Joint Pretrial Statement, Uncontested Facts, ¶ 10; 9/8/97 Tr. at 58:18–63:2 (Peters)].

14. Through such contractual relationships, referred to in the industry as "interline agreements," an airline may honor the tickets of other airlines and have its own tickets honored by other carriers. [Joint Pretrial Statement, Uncontested Facts, ¶ 15; 9/8/97 Tr. at 58:18–62:7 (Peters)].

15. A majority of the domestic airlines participate in interline agreements and each participating airline receives certain benefits from its participation. [Joint Pretrial Statement, Uncontested Facts, ¶ 16; 9/8/97 Tr. at 57:17–62:7 (Peters)]. These benefits include the ability to have a ticketing airline issue tickets for certain legs of a trip for carriage on other airlines, the convenience of being able to check baggage through multiple airlines, and the ability to help ticketed passengers on another airline reach their destinations when mechanical or other problems interrupt a scheduled flight. [9/8/97 Tr. at 60:3–13, 61:14–62:7 (Peters)].

#### D. *Midway and American Operated Under an Interline Agreement*

16. Midway and American entered into an interline agreement entitled Bilateral Traffic Agreement (the "Bilateral Agreement") on November 12, 1984. [Joint Pretrial Statement, Uncontested Facts, ¶ 17; 9/8/97 Tr. at 62:13–16 (Peters); American's Exhibit No. 6; Trustee's Exhibit No. 1].

17. The Bilateral Agreement governed the parties' respective rights and obligations for providing passenger transportation services to one another. [9/8/97 Tr. at 65:22–66:1 (Peters); American's Exhibit No. 6; Trustee's Exhibit No. 1].

18. The Bilateral Agreement governed the manner in which Midway and American accommodated passengers and baggage when the airline originally scheduled to provide transportation was unable to do so. *Id.* Among other things, interline agreements allowed Midway and other airlines to issue tickets on their own ticket stock for legs of transportation on other participating airlines. [9/8/97 Tr. at 59:4–62:7 (Peters)].

19. In 1986, the parties executed Addendum No. 1 to the Bilateral Agreement, effective May 1, 1986. This addendum added a "penalty provision." The addendum provided that to the extent passengers were transported on a carrying airline which accepted a restricted fare ticket, the carrying airline would be entitled to the coupon fare minus any fees or penalties specified (in % terms or dollars) in the ticketed carrier's tariff. [9/8/97 Tr. at 74:14–23 (Peters); American's Exhibit Nos. 6 and 9; Trustee's Exhibit No. 1].

20. In March 1989, the parties amended the Bilateral Agreement for a second time. This amendment modified the penalty provision embodied in Addendum No. 1 to the Bilateral Agreement, with the parties agreeing that the penalty provision would not apply in situations involving any interruption of service on a schedule airline, including interruption of service due to work stoppage. [9/8/97 Tr. at 75:2–22 (Peters); American's Exhibit Nos. 6–8; Trustee's Exhibit No. 1].

21. There is no dispute that Midway assumed the Bilateral Agreement on or after March 25, 1991. [Trustee's Answer to Request to Admit No. 11].

22. Any changes to the Bilateral Agreement were required to be in writing signed by both parties. [Trustee's Exhibit No. 1, § 8.9; American's Exhibit No. 6, § 8.9].

23. The Bilateral Agreement had to be renewed by the parties in writing on a

monthly basis, otherwise it would terminate at the end of the month. [9/8/97 Tr. at 76:16–24 (Peters); 9/9/97 Tr. at 41:10–12 (Peters); Trustee's Exhibit No. 1, § 6.1; American's Exhibit No. 6, § 6.1].

24. In each month that Midway operated in Chapter 11, this extension was initiated by an offer from American to extend the Bilateral Agreement for another month. [9/8/97 Tr. at 76:4–78:3 (Peters); American's Exhibit No. 125].

25. Midway and American extended the Bilateral Agreement in writing through November 30, 1991. [9/8/97 Tr. at 77:10–78:3 (Peters); American's Exhibit Nos. 125 and 126].

26. American did not extend or seek to extend the Bilateral Agreement beyond November 30, 1991. [9/9/97 Tr. at 41:18–24 (Peters)].

27. Thus, the Bilateral Agreement was in place at the time Midway ceased operations on November 13, 1991. [9/8/97 Tr. at 78:9–16 (Peters); 9/9/97 Tr. at 117:12–25 (Zeko); American's Exhibit Nos. 125 and 126].

28. Either party could unilaterally terminate the Bilateral Agreement upon seven days' written notice. [Trustee's Exhibit No. 1, § 6.2; American's Exhibit No. 6, § 6.2].

29. Moreover, American could unilaterally terminate the Bilateral Agreement immediately upon Midway's cessation of flight operations. [Trustee's Exhibit No. 1, § 6.3; American's Exhibit No. 6, § 6.3].

30. At no time did American ever advise the Court that it did not intend to abide by the Bilateral Agreement if Midway ceased flight operations.

31. Midway, as a debtor-in-possession, and American continued to operate under the Bilateral Agreement throughout Midway's Chapter 11 proceeding. [9/8/97 Tr. at 76:4–15 (Peters)].

32. Midway's Chapter 11 filing had no practical effect on the way American and Midway did business. *Id.*

33. American continued to perform services for Midway pursuant to the Bilateral Agreement post-petition, including the transportation of passengers who purchased tickets from Midway on or before November 13, 1991, non-transportation services, and ground handling services. [Joint Pretrial Statement, Uncontested Facts, ¶ 23; 9/8/97 Tr. at 76:4–15, 79:8–81:3 (Peters)].

34. American took no action to terminate the Bilateral Agreement during Midway's Chapter 11 proceeding. In fact, Jonathan Peters, Manager of Interline Administration for American since 1988, operated with the understanding that American had been ordered by the Court not to terminate the Bilateral Agreement. [9/8/97 Tr. at 76:10–15 (Peters)].

35. Peters was responsible for coordinating American's relationship with other airlines as well as developing policies and procedures for interline matters and the interpretation of interline agreements. [9/8/97 Tr. at 57:2–58:6 (Peters)].

36. Peters has been a member of the Interline Sales and Marketing Conference and has been a member of their board of directors for years. He has also been responsible for participating in working groups and committees of the Air Transport Association and the International Air Transport Association. [9/8/97 Tr. at 58:7–17 (Peters)].

37. Peters was American's person for contact between Midway and American from 1988 through November 13, 1991, regarding interline matters. [9/8/97 Tr. at 63:13–64:4 (Peters)].

38. Peters was familiar with and had occasion to work with the Bilateral Agreement, and had the responsibility on behalf of American to handle any issues involving its interpretation. [9/8/97 Tr. at 64:18–65:4 (Peters)].

### E. *Midway and American Cleared Their Interline Accounts Through the Airlines Clearing House*

39. Due to the interdependent nature of the airline business and the fact that multilateral and bilateral agreements are so common in the airline industry, the industry participants established a clearinghouse system in 1948 through which interline billings of member airlines are settled. The entity

responsible for settling interline accounts is known as the Airlines Clearing House, Inc. (the "ACH"), a Delaware-chartered corporation owned by the airlines. [Joint Pretrial Statement, Uncontested Facts, ¶ 10; 9/9/97 Tr. at 80:14–81:10 (Zeko) ].

40. The ACH settles the accounts of its members and associate members on a monthly basis. The clearing and settling function of the ACH is performed by the Chase Manhattan Bank of New York (clearing bank). Each member airline submits its respective interline charges for passenger transportation, cargo transactions, non-transportation and Universal Air Travel Plan ("UATP") charges to the clearing bank on a monthly basis. [9/9/97 Tr. at 80:1–81:9, 87:2–90:22 (Zeko) ].

41. The ACH settlement procedures are encompassed in the ACH Manual of Procedure. [9/9/97 Tr. at 82:4–9 (Zeko); American's Exhibit No. 210].

42. Mark Zeko was Manager of Passenger Interline Accounting for American from 1978 to 1995 and was the person responsible at American during that period for interline accounting. Zeko had an organization of approximately 90 people whose responsibilities were to bill other airlines and to review billings from other airlines. In 1991, he was responsible for supervising billing relationships with approximately 250 airlines. [9/9/97 Tr. at 79:4–25 (Zeko) ].

43. Zeko sat on the Board of Directors of the ACH from 1988 through 1995, as well as the International Air Transport Association clearinghouse during the same time period. He was President of the ACH during the period 1990 through 1991, and sat on several ACH task forces, including one which rewrote the ACH Manual of Procedure in the mid–1970's and again in the mid–1980's. [9/9/97 Tr. at 81:15–82:3 (Zeko) ].

44. Zeko was familiar with the process by which airlines cleared their accounts during the relevant time period. [9/9/97 Tr. at 81:11–14 (Zeko) ].

45. Generally speaking, airlines (or their agents) write tickets on their own ticket stock and can write these tickets specifying carriage over other airlines. The airline whose ticket stock is used to write the ticket collects the payment from the passenger. [9/8/97 Tr. at 59:4–61:7 (Peters); 9/9/97 Tr. at 5:10–17 (Peters) ].

46. The moment an airline sells a ticket on its ticket stock specifying travel either on its airline or another airline, it holds the payment as an unearned revenue liability and that liability shows on the selling carrier's books. This is sometimes referred to as air traffic liability or "ATL." That liability is discharged if the passenger decides to either utilize the ticket on that airline, exchanges a ticket for a different ticket on that same airline, obtains a refund for the ticket or uses that ticket on another airline. [9/9/97 Tr. at 83:9–86:1 (Zeko); American's Exhibit No. 213].

47. Midway became an associate member of the ACH on October 10, 1986. [Midway's Answer to Request to Admit No. 1].

48. American was a member of the ACH throughout the relevant time frame. American and Midway agreed that the settlement of their accounts would be in accordance with the provisions of the ACH Manual of Procedure. [9/9/97 Tr. at 98:9–101:7 (Zeko); American's Exhibit No. 210].

49. On March 27, 1991, the ACH informed American by teletype that Midway would continue to clear its accounts through the ACH. The ACH specifically stated:

These orders and the related motions filed by Midway all indicate that Midway intends to continue honoring its pre-petition interline agreements and to continue participating in normal settlements through ACH without regard to any possible distinctions between pre-petition and post-petition transactions.

[American's Exhibit Nos. 14 and 15].

50. In late December, 1991, Midway was suspended from the ACH. [9/9/97 Tr. at 122:13–17 (Zeko); American's Exhibit No. 33].

## F. *Billing Methods in the Interline Process*

51. There are two methods of billing in the interline process: sampling and nonsam-

pling. Sampling airlines agree to settle each other's accounts using an agreed upon sampling methodology. Non-sampling airlines agree to settle based on pricing every coupon. [9/9/97 Tr. at 91:11–92:5 (Zeko) ].

52. Midway was a non-sampling airline in clearing its interline accounts with American. [9/9/97 Tr. at 97:21–98:8 (Zeko) ].

53. The two most common ways in which the carrying airline obtains possession of a ticket specifying travel on another airline is either through a "lift" transaction or an "exchange" transaction. A lift transaction involves a situation where the carrying airline utilizes the passenger's original ticket for transportation on the carrying airline. [*See generally* 9/9/97 Tr. at 84:25–85:15 (Zeko) ]. An exchange transaction involves a situation where the carrying airline exchanges the passenger's ticket for a ticket issued on the ticket stock of the carrying airline. [*See generally* 9/9/97 Tr. at 85:17–86:1 (Zeko) ].

54. A ticketing airline becomes liable to the carrying airline for payment for a lift transaction at the time the flight coupon is lifted when the ticketed passenger flies and usually bills the other airline in the month it honors the flight coupon. [9/9/97 Tr. at 92:15–24 (Zeko) ].

55. In accordance with industry custom and practice and ACH procedure, a ticketing airline becomes liable to a carrying airline for payment for an exchange transaction at the time of the exchange, not at the time the passenger actually uses the ticket. In other words, and in contrast to a lift transaction, the liability for the exchange transaction shifts from the ticketing airline's liability to the carrying airline at the time of the exchange. [9/9/97 Tr. at 92:25–96:7 (Zeko); American's Exhibit No. 215].

56. In accordance with industry custom and practice, a carrying airline bills an interline partner for an exchange transaction in the month that the ticket is reissued or exchanged. [9/9/97 Tr. at 93:21–94:1 (Zeko); American's Exhibit No. 215].

57. For passenger transportation, ACH procedures require the carrying airline to submit to the ticketing airline a summary sheet detailing the amounts owed under the various ACH code classifications, back-up detail on a ticket-by-ticket basis supporting the total charges, as well as the underlying tickets lifted or exchanged by the carrying airline in the course of the transaction. [9/9/97 Tr. at 87:5–88:15 (Zeko); American's Exhibit Nos. 210 and 214].

58. No additional supporting documentation, such as passenger name records or flight manifests is required to support payment. [9/9/97 Tr. at 88:11–22 (Zeko); 9/16/97 Tr. at 39:13–21 (Thompson); American's Exhibit No. 210].

59. When American lifted or exchanged a ticket from a Midway passenger, American gained possession of that ticket and that ticket was returned to Midway through the ACH clearing process. [9/9/97 Tr. at 86:2–13 (Zeko) ].

60. The ACH clearing bank receives a recap sheet from all member airlines by the 19th day of the month following the clearing month (*i.e.*, the month in which the tickets are lifted or exchanged), which summarizes the numbers for each airline. [9/9/97 Tr. at 88:23–89:8 (Zeko); American's Exhibit No. 214].

61. On the 21st day of the month following the clearing month, the clearing bank sends out a recap of all interline charges. The clearing bank nets out all debits and credits on each airline's account and shows each airline to be in a net debtor or net creditor position. [9/9/97 Tr. at 89:10–90:22 (Zeko); American's Exhibit No. 214].

62. On the 28th day of the month following the clearing month, funds are transferred into and out of each member's account. If an airline is a net creditor, funds are transferred into that airline's account by the clearing bank. If an airline is a net debtor, the debtor airline must deposit funds in the Chase Manhattan Bank to satisfy its debtor position. [9/9/97 Tr. at 90:4–22 (Zeko); American's Exhibit No. 214].

63. The ACH procedures prescribe how and under what circumstance a ticketing airline can object to the charges claimed against it by another airline. According to the ACH Manual of Procedure for non-sampling airlines, each airline has up to six months from

the submission month to reject any claims made against it through the ACH. If an airline waits longer than six months, those objections are waived. [9/9/97 Tr. at 90:23–91:10, 109:13–110:1 (Zeko); American's Exhibit No. 210 at § C.7; American's Exhibit No. 214].

64. To make a rejection, the ticketing airline both identifies the dollar amount of the rejected claims on its monthly submission to the clearing bank (Source Code 004) and provides back-up information (including a copy of the ticket and the reason for the rejection) to the submitting airline. Once a rejection is made, the ticketing airline receives immediate credit to its account for the amount of the rejected claim, regardless of whether or not the submitting airline agrees with the rejection. [9/9/97 Tr. at 109:13–112:23 (Zeko) ].

65. It was and is industry practice that airlines accept the initial billing of a submitting airline "in good faith" and pay the billing through the clearinghouse. The ticketing airline then has up to six months to perform an audit to determine what the appropriate values of the coupons should be. [9/11/97 Tr. at 26:13–27:10 (Zeko); American's Exhibit Nos. 210 and 214].

66. In full accordance with ACH procedures, the submitting airline has an additional six months from any rejection to analyze, audit and determine whether or not the rejection is proper. If the airline disagrees with the rejection, it can then rebill the ticketing airline for the amount of the disputed claim. [9/9/97 Tr. at 110:14–111:15 (Zeko); American's Exhibit Nos. 210 and 214].

67. To the extent the ticketing airline still disagrees with the rebilled amount of the claim, it then has six months to once again reject the claim. Following the six month re-rejection period, any further disputes are undertaken by correspondence between the submitting and ticketing airline. [9/9/97 Tr. at 90:23–91:10 (Zeko); American's Exhibit Nos. 210 and 214].

68. To the extent the carriers reach an impasse, the dispute goes to the Committee on Differences at the ACH, which consists of binding arbitration by a three-member panel.

[9/11/97 Tr. at 69:11–70:21 (Zeko); American's Exhibit No. 50].

## G. *The Bilateral Agreement Between Midway and American Governed the Settlement of Their Interline Accounts*

69. Section 1.11 of the Bilateral Agreement governed the manner by which Midway and American had agreed to settle their interline accounts. [9/9/97 Tr. at 98:9–101:7 (Zeko); American's Exhibit No. 6; Trustee's Exhibit No. 1].

70. ... Specifically, Section 1.11(i) provided that if both carriers were members or associate members of the ACH, the carriers would settle their accounts through the ACH in accordance with the ACH settlement agreements:

(i) Settlement for items covered by this Agreement between parties who are stockholders or associate members of Airlines Clearing House, Inc., a Delaware stock nonprofit corporation, will be made through Airlines Clearing House, Inc., in accordance with the agreements known as: "Agreements Relating to the Settlement of Interline Accounts Through Airlines Clearing House, Inc.," dated February 1, 1948, and "Agreement Establishing Associate Membership in the Airline Clearing House, Inc. for the settlement of Interline Accounts," dated January 21, 1971, and certain agreements between Airlines Clearing House, Inc. and its stockholders and associate members referred to in such agreements.

[9/9/97 Tr. at 98:9–99:6 (Zeko); American's Exhibit No. 6; Trustee's Exhibit No. 1].

71. The Bilateral Agreement in Section 1.3 provided the protocol for honoring interline tickets or other types of tickets. [9/8/97 Tr. at 66:2–14 (Peters) ]. Specifically, Section 1.3.1 governed the agreement of each respective airline to carry passengers over its lines of tickets issued by the other airline:

Each party hereto agrees to honor for transportation over its lines Interline Tickets issued by the other party hereto and calling for such transportation, and each party agrees to issue Interline Tickets in exchange for Miscellaneous Documents issued by the other party hereto and calling

for transportation over lines of such party, provided that such Interline Tickets or Miscellaneous Documents have been issued in accordance with Paragraph 1.2 above. [American's Exhibit No. 6, § 1.3.1; Trustee's Exhibit No. 1, § 1.3.1].

72. Section 1.3.2 of the Bilateral Agreement governed the parties' agreement to carry passengers holding tickets on the other airline for travel over the other airline or any other airline. [9/8/97 Tr. at 66:21–67:4 (Peters)]. Under this section of the Bilateral Agreement, American could, but was not obligated to, accommodate passengers holding tickets for travel on Midway Airlines. [9/8/97 Tr. at 67:5–10 (Peters)]. The Bilateral Agreement provided in relevant part:

Either party hereto may, but is not obligated to, accept for ... travel over its lines, a ticket issued by the other party (or an agent on behalf of such other party) and specifying travel over the lines of such other party or any other airline.

[American's Exhibit No. 6, § 1.3.2; Trustee's Exhibit No. 1, § 1.3.2].

73. The Bilateral Agreement contained no provision that prohibited either airline carrying the other parties' passengers pursuant to Section 1.3.2 from placing reasonable guidelines on that carriage. [9/8/97 Tr. at 74:4–8 (Peters); American's Exhibit No. 6; Trustee's Exhibit No. 1].

74. It was the custom and practice in the industry when transporting passengers holding the other airline's tickets to place reasonable guidelines on the carriage of those passengers. [9/8/97 Tr. at 73:19–74:3 (Peters)].

75. Throughout the course of the relationship between Midway and American, whenever American honored a Midway airline ticket, American placed reasonable guidelines on the carriage of passengers holding such tickets. [9/8/97 Tr. at 72:24–74:8 (Peters)].

76. Section IV of the Bilateral Agreement governed the payment obligations involving involuntary rerouting of passengers pursuant to schedule irregularities. In those cases, the compensation paid to the carrying airline was based on a rate equal to a certain percentage of the transporting carrier's normal coach (Y) fare in the marketplace. Initially, Midway and American agreed in the Bilateral Agreement to compensate each other at a rate equal to 75% of the transporting carrier's normal coach (Y) fare, but in July 1990, the parties modified the agreement to settle at the industry rate as outlined in the Airlines Clearing House Manual of Procedure. [American's Exhibit Nos. 6, 156 and 210; Trustee's Exhibit No. 1].

77. Section IV of the Bilateral Agreement did not govern the parties' compensation when a passenger was involuntarily rerouted for reasons other than schedule irregularities. [American's Exhibit No. 6; Trustee's Exhibit No. 1].

78. Section 6.4 of the Bilateral Agreement provided that the termination of the Agreement did not relieve the parties from obligations which they incurred before the effective date of termination. *Id.*

79. The Bilateral Agreement contemplated the possibility that a party to the Agreement could cease operating, and it provided that the other airline *may*, but was not obligated to, terminate the Agreement:

If either party (the "Defaulting Party") becomes insolvent; ... or if the Defaulting Party either ceases or suspends operations for reasons other than a strike, then the Insecure Party may immediately terminate this Agreement on notice to the Defaulting Party....

[American's Exhibit No. 6, § 6.3; Trustee's Exhibit No. 1, § 6.3].

80. Pursuant to the Bilateral Agreement, the parties agreed that they would present any objections to a particular invoice item within six months of the date of the disputed invoice. [American's Exhibit No. 6; Trustee's Exhibit No. 1; 9/9/97 Tr. at 98:9–100:20 (Zeko)].

81. Section 1.11(iii) of the Bilateral Agreement provided, in relevant part, that if one of the carriers was no longer a member of the ACH, the parties would settle their accounts in accordance with the following procedures:

(iii) Settlement of amounts payable pursuant to this Agreement between parties who

are not members of Airline Clearing House, Inc. or the IATA Clearing House, Inc. shall be made on net balance in the currency of the United States as follows:

(a) Within twenty-five (25) days following the close of each calendar month, the Carrying Airline will prepare itemized invoices (in accordance with Paragraph 10.A.(ii)(e) below) of the Issuing Airline's Tickets and Miscellaneous Documents, which were honored by the Carrying Airline during the previous month, and will forward such invoices postmarked not later than the 25th day following the close of each calendar month to the Issuing Airline....

(b) Within forty-five (45) days following the close of each calendar month, the net difference between the respective invoices of the parties shall be settled by the net debtor party directly remitting the net difference in U.S. funds to the other party....

When one party questions the correctness of an item invoiced to it by the other party, it will nevertheless pay the item as invoiced and take exception thereto by reinvoicing the item at the disputed difference between the amount billed and the amount acceptable. Items so reinvoiced will be supported by the document (Ticket, MCO, transportation receipt, or credit) which supported the original invoice and a complete explanation of the reason for taking such exception.

1. Any adjustments required as a result of post audit shall be recognized by the billing party up to and including the sixth invoice month from the original invoice month in which the last billing was made.

2. Documents must be rejected and invoiced within the six-month period allowed for audit.

3. When the billing party receives a second rejection of a disputed document and a disagreement still exists, all such items shall be excluded from the billing/settlement process. The airline which originated the billing shall be responsible for originating

correspondence to the other party in order to finalize the disputed transaction.

[9/9/97 Tr. at 100:5–12 (Zeko); American's Exhibit No. 6; Trustee's Exhibit No. 1].

82. Section 1.11(iii) was incorporated into American's form interline agreement to ensure that "our procedures with carriers, whether they were ACH members or not ACH members, would be the same, basically the same." [9/9/97 Tr. at 99:18–100:20 (Zeko)].

83. The procedures delineated in Section 1.11(iii) of the Bilateral Agreement were the same as the ACH billing procedures. [9/9/97 Tr. at 99:22–100:4 (Zeko); American's Exhibit No. 6; Trustee's Exhibit No. 1].

84. It was industry custom and practice that carriers would follow the ACH procedures in settling their accounts even if one of the carriers was not a member of the ACH. [9/9/97 Tr. at 100:13–101:7 (Zeko)].

## H. *Effect of Midway's Exit From Certain Markets on the Relationship With American*

85. Both prior to and during Midway's operation in Chapter 11, Midway ceased flight operations from certain locations. In each instance where American was asked to accommodate passengers displaced on account of this termination of service, American and Midway negotiated a separate city closing agreement enumerating the manner in which the passengers were to be accommodated and the manner in which the economic responsibility was to be allocated between the parties. These city closing agreements were reduced to writing and were not communicated to American's personnel until written acceptance was received. [Trustee's Exhibits Nos. 45–46, 49–53].

86. If either Midway or American exited a city market and did not execute a city closing agreement, the Bilateral Agreement would govern the manner in which passengers displaced by the city exit would be accommodated by the other party. [9/9/97 Tr. at 12:23–25 (Peters)].

87. American was notified by the ACH on November 14, 1991 that Midway had ceased scheduled air carrier transportation services. [Trustee's Exhibit No. 54].

### I. American's Interline Billing Practices Regarding Midway

88. American processed its interline billings to other airlines at a facility in Barbados. [9/9/97 Tr. at 101:19–102:13 (Zeko); 9/10/97 Tr. at 16:25–17:8 (Zeko); 9/11/97 Tr. at 75:10–17 (Nelson) ].

89. American did not instruct its keypunch operators in Barbados to ensure that Midway tickets were keyed in or billed at face value [9/9/97 Tr. at 155:3–13 (Zeko) ], nor did American have any safeguards or review process in place to verify the Barbados keypunch entries for accuracy. [9/10/97 Tr. at 21:6–22:7 (Zeko) ].

90. During the period of April, 1991 through November, 1991, Midway rejected 6057 items, totaling $884,448.52 back to American. [9/10/97 Tr. at 47:5–51:7 (Zeko); Trustee's Exhibit Nos. 38–44].

91. During the period of May, 1991 through March, 1992, American rebilled two items totaling $278.38 back to Midway. [9/10/97 Tr. at 43:13–47:4 (Zeko); Trustee's Exhibit Nos. 26–36].

92. In November, 1991, American estimated that Midway would reject 30% of the exchanged tickets. [9/9/97 Tr. at 157:21–161:21 (Zeko); Trustee's Exhibit No. 74].

93. Later, American estimated its over billing for two batches of exchanges as being as high as 52%. [Trustee's Exhibit No. 77].

94. American's comparison of 98 batches of exchanges before and after they were manually repriced in Tulsa revealed that the average batch was overpriced by 45% in Barbados, a difference of $18,717.00 per batch. [Trustee's Exhibit No. 78].

95. As late as February 24, 1992, American still predicted the Midway rejection rate to be 45%. [Trustee's Exhibit No. 89]. Instead of adjusting for this discrepancy, however, American elected to "let them flow as normal." *Id.*

96. American billed Midway for over 57,-000 exchanges for November, 1991, while American normally billed about 50,000 exchanges total for all non-sampling airlines in a given month. [9/9/97 Tr. at 126:11–18 (Zeko) ]. The exchanges billed to Midway for November, 1991 were twice or more the exchanges billed to all other non-sampling airlines. *Id.*

### J. Summary of Interline Activity Between the Parties

97. Prior to filing for Chapter 11 protection in March 1991, Midway routinely audited American's ACH submissions on a ticket-by-ticket basis. [Midway's Answer to Request to Admit No. 8].

98. Peters, American's interline expert, believed that the majority of transactions after Midway ceased flight operations would have been lifts rather than exchanges. [9/9/97 Tr. at 18:2–10 (Peters) ].

99. On November 26, 1991, Peters warned that American should watch the level of the exchange of Midway tickets. [Trustee's Exhibit No. 66].

100. On December 4, 1991, it was reported to, among others, Zeko, the manager of interline accounting, that American had exchanged over 60,000 Midway tickets in November. [Trustee's Exhibit No. 70].

101. In spite of Peters' warnings regarding the level of exchanges, American continued to effect exchanges of Midway tickets and in fact exchanged over 22,000 additional Midway tickets in December, 1991 and January, 1992. [Trustee's Exhibit Nos. 33 and 34].

102. In November, 1991, the month Midway ceased active flight operations, American exchanged nearly two Midway coupons for every one Midway coupon it lifted. [Trustee's Exhibit No. 32].

103. Because Zeko was concerned about the volume of exchange transactions and the possibility that they may be overpriced (particularly because of the numerous papers involved in exchange transactions), he instructed Gordon Nelson to manually reprice all of the exchanges after they had been run through the computer program in Barbados.

[9/9/97 Tr. at 124:7–125:16, 156:15–157:15 (Zeko) ].

104. The lifts and exchanges came from the same pool of tickets. [9/10/97 Tr. at 31:8–15 (Zeko) ].

105. American never manually repriced the lifts billed to Midway for November, 1991. [9/9/97 Tr. at 127:1–19, 163:24–164:15 (Zeko); 9/11/97 Tr. at 102:3–17 (Zeko) ]. Zeko testified that the reason he did not believe repricing of the lifts was necessary was because he believed the Barbados computer system to be correct. [9/9/97 Tr. at 146:6–147:9 (Zeko) ].

**K. Commuter Was Affiliated With Midway and Billed on Its Ticket Stock**

106. Commuter was affiliated with Midway during the relevant time frame.

107. Prior to and during the Chapter 11 proceeding, Midway permitted Commuter to use its ticket stock in selling tickets to passengers. [9/9/97 Tr. at 115:6–116:4 (Zeko); 9/16/97 Tr. at 41:21–42:23 (Thompson) ]. This means that for any ticket sold for travel on Commuter, Midway collected the funds from the passenger. [9/9/97 Tr. at 115:6–116:4 (Zeko) ].

108. It was industry custom and practice during the relevant time period for a commuter carrier affiliated with a larger airline to write tickets using the ticket stock of the larger airline. [9/9/97 Tr. at 112:24–115:21 (Zeko) ].

109. It was industry custom and practice for a submitting airline to bill the airline whose ticket stock was used because it held the funds and had the liability on its books. [9/9/97 Tr. at 115:12–21 (Zeko) ].

110. Throughout the course of the Chapter 11 proceeding, Midway continued to permit Commuter to clear its transactions with other airlines, including American, through Midway's account at the ACH. [Midway's Answer to Request to Admit Nos. 8, 9 and 21; 9/16/97 Tr. at 42:18–23 (Thompson) ].

111. After Midway ceased operations, American continued to bill lift and exchange transactions for Commuter to Midway's account and neither Midway nor the Trustee

ever complained. [9/9/97 Tr. at 115:22–116:4 (Zeko) ].

112. Prior to and during the Chapter 11 proceeding, Midway never took exception to the fact that American was billing lift and exchange transactions for Commuter through Midway's account at the ACH. [9/9/97 Tr. at 115:22–116:4 (Zeko) ].

113. Commuter flights were identified by four-digit flight numbers. [9/15/97 Tr. at 105:6–21 (Thompson) ].

114. At the time Midway ceased flight operations, the cities of Madison and Milwaukee, (Wisconsin), Rockford, Moline, Peoria, Springfield, Bloomington/Normal, Champaign/Urbana, (Illinois), South Bend, Indianapolis, (Indiana), Toledo, (Ohio), Traverse City, Grand Rapids and Kalamazoo, (Michigan) were serviced by Commuter. [9/15/97 Tr. at 105:22–106:11 (Thompson); Trustee's Exhibit No. 181].

**L. After Filing For Chapter 11 Protection, Midway Took Steps To Ensure That Its Operations Would Continue Without Interruption**

115. Immediately upon filing for Chapter 11 protection, Midway, as a debtor-inpossession, took all possible steps to ensure that Midway's operations would continue without interruption with respect to its passengers and the industry.

116. First, on or about March 25, 1991, Midway filed a Motion for a Temporary Restraining Order against American, other airlines and other airline-related entities. [American's Exhibit No. 45, Complaint for Injunction]. Midway specifically requested that the Court prohibit American from terminating the Bilateral Agreement based on Midway's filing of a petition for reorganization under Chapter 11. [American's Exhibit No. 45, Memorandum of Law in Support of Motion for a Temporary Restraining Order and Preliminary Injunction, p. 9].

117. Midway proclaimed that the continuation of its interline agreements with American and other airlines was necessary, because, "[w]ithout the benefits of the interline ... agreements, Midway's operations would be crippled." [American's Exhibit No. 45,

Affidavit of Thomas E. Schick in Support of Motion for a Temporary Restraining Order, ¶ 19].

118. Midway, as a debtor-in-possession, agreed that "[v]irtually every aspect of Midway's ability to function as an airline depends upon the Industry [Interline, ACH, IATA, ... ] Agreements. Therefore, Midway's ability to remain in business depends upon the preservation of the prepetition status quo under these Agreements." [American's Exhibit No. 45, Affidavit of Thomas E. Schick, ¶¶ 29 and 30].

119. As a result of Midway's representations, this Court ordered American and the other defendants to "continue to perform their respective obligations to [Midway], which each such party was required to perform under any of the Industry Agreements to which [Midway] was a party or a beneficiary before the commencement of [Midway's] Chapter 11 cases, including to honor in accordance with the terms of the Industry Agreements any tickets, passes or other documents for transportation of persons or property on or after March 26, 1991...." [American's Exhibit No. 45, Temporary Restraining Order, p. 5].

120. After having had the Court enter the temporary restraining order, Midway as a debtor-in-possession, then set out to assume various industry contracts that were entered in the Midway Chapter 11 proceeding.

121. Pursuant to motion, Midway was permitted to assume its agreements with the Airlines Reporting Corporation on March 26, 1991. Assumption of these agreements allowed Midway to continue to facilitate the sale of its air transportation services through travel agents. [Joint Pretrial Statement, Uncontested Facts, ¶ 11; American's Exhibit No. 48].

122. The Court granted Midway's motion to assume its agreements with the ACH on March 26, 1991. Assumption of these agreements allowed Midway to continue to settle its interline accounts with participating airlines through the ACH. [Joint Pretrial Statement, Uncontested Facts, ¶ 14; American's Exhibit No. 50].

123. In Midway's Motion to Assume Airline Clearing House Agreements, Midway advised the Court of the dire consequences facing Midway if it did not continue its relationships with American and the other airlines with whom it had Bilateral Agreements:

The ACH provides Debtors with an essential revenue-generating means. The ACH enables Debtors to sell services and settle accounts through and between other airlines. In addition, the ACH enables Debtors to capture part of the total revenue generated by passengers who might otherwise switch carriers, completely, due to Debtors' inability to service one leg of their journey. Equally important is the ACH's ability to enable member airlines to honor tickets issued for travel on other member airlines, and receive payment for baggage claim services performed on behalf of other member airlines. Since a large portion of Debtors' revenues arise as a result of their membership in the ACH, a rejection of the ACH Agreements would permanently impair Debtors' ability to reorganize.

[American's Exhibit No. 50, Debtors' Motion to Assume ACH Agreements, p. 4].

124. The Court also granted Midway's motion to assume its agreements with the International Air Transport Association (IATA) on March 26, 1991. [American's Exhibit No. 49]. Like the ACH, IATA is an international clearinghouse, formed by its member airlines, which settles air travel or related interline obligations among its international members. Midway proclaimed that "since a significant portion of Debtors' revenues arise as a result of their participation in the IATA, a loss of the right to participate would primarily impair Debtors' ability to reorganize." [American's Exhibit No. 49, Order Permitting Debtors to Assume IATA Agreements; Debtors' Motion to Assume IATA Agreements].

125. The Court authorized Midway to pay/honor certain pre-petition obligations. The Court permitted Midway to honor pre-petition tickets as well as those obligations incurred as a result of "interline arrangements." Indeed, the Court "allow[ed] ACH to offset and net amounts processed by the

numerous entities that utilize ACH in accordance with ACH's normal procedures by entering an order modifying the stay imposed by § 362 of the Bankruptcy Code and allow Midway to pay any net amounts owing pursuant to the ACH and related interline agreements for services rendered pre-petition." [American's Exhibit No. 47, Order Authorizing Payment or Honoring of Certain Pre–Petition Obligations].

126. In addition, the Court permitted Midway to assume its credit card agreements with American Express Company, First National Bank Association, Citicorp Diners Club, Inc., enRoute Card, Inc. and UATP on March 26, 1991. In its motion, Midway proclaimed that "[c]redit card sales constitute nearly 75% of the total sales generated by Debtors. Credit cards are unquestionably an essential part of the Debtors' business. Without the ability to utilize credit cards, Debtors will simply be unable to reorganize." [American's Exhibit No. 44, Order Permitting Debtors to Assume Credit Card Agreements; Motion to Assume Credit Card Agreements].

127. Midway also assumed the Bilateral Agreement between Midway and American on or after March 25, 1991. [Trustee's Answers to Request to Admit No. 11].

**M. _Both Parties Continued to Perform Under the Bilateral Agreement After Midway Filed Under Chapter 11_**

128. Throughout the course of the Chapter 11 proceeding, Midway continued to clear its interline accounts through the ACH. [9/9/97 Tr. at 116:5–21 (Zeko) ].

129. Zeko testified that the bankruptcy had no effect on the way American and Midway cleared their accounts with each other because the Court ordered that Midway was to remain in the ACH. [9/9/97 Tr. at 116:9–17 (Zeko) ].

130. American continued to bill Midway through the ACH throughout the Chapter 11 proceeding and was paid for those transactions. _Id._

131. Throughout the course of the Chapter 11 proceeding, Midway recognized that it had six months to reject American's claims.

[9/9/97 Tr. at 116:22–25 (Zeko); 9/16/97 Tr. at 46:20–47:5 (Thompson) ].

132. Throughout the course of its Chapter 11 proceeding, Midway continued to audit American's ACH submissions on a ticket-by-ticket basis. [Midway's Answer to Request to Admit No. 9].

133. Midway continued to audit other airlines' submissions throughout the Chapter 11 proceeding so long as they were being made through the ACH. [9/16/97 Tr. at 44:19–23 (Thompson) ].

134. Midway continued to reject claims through the ACH throughout the Chapter 11 proceeding. [9/9/97 Tr. at 116:22–25 (Zeko) ].

**N. _Under the Bilateral Agreement, American Transported Midway Passengers After Midway Shutdown_**

135. Midway ceased its flight operations as of midnight on November 13, 1991. _See_ Underlying Material Background Facts for All Counts of the Complaint, ¶ 2.

136. The Bilateral Agreement was in place at the time Midway ceased operations. _See_ Underlying Material Background Facts for All Counts of the Complaint, ¶ 27.

137. Following Midway's cessation of operations, American could, but was not obligated to, transport Midway-ticketed passengers pursuant to the terms of the Bilateral Agreement. [9/8/97 Tr. at 67:5–10 (Peters); 9/9/97 Tr. at 43:3–8 (Peters) ].

138. Although the Bilateral Agreement expired on November 30, 1991, on November 14, 1991, American announced that it would accommodate Midway-ticketed passengers for travel through January 15, 1992. [9/8/97 Tr. at 94:1–20 (Peters); Trustee's Exhibit Nos. 58 and 59; American's Exhibit No. 22].

139. On November 15, 1991, American removed the January 15 travel cutoff and announced that it would accommodate Midway-ticketed passengers for an indefinite amount of time. [Trustee's Exhibit Nos. 60 and 61].

140. American transported the stranded Midway-ticketed passengers during the period November 1991 through April 1992 pursu-

ant to the terms of the Bilateral Agreement. [9/8/97 Tr. at 80:1–81:3 (Peters) ].

141. After November 13, 1991, American was not required to enter into negotiations with Midway to fly the Midway-ticketed passengers. The parties had an active Bilateral Agreement which permitted American to honor Midway tickets sold for use on Midway. American's acceptance of the Midway tickets was fully supported by the Bilateral Agreement. [9/8/97 Tr. at 105:21–106:6 (Peters) ].

142. Even if the Bilateral Agreement did terminate on November 30, 1991, industry custom and practice dictated that American could honor all Midway tickets that were issued prior to Midway's shutdown pursuant to the Bilateral Agreement. [9/8/97 Tr. at 80:8–81:3 (Peters) ].

143. After Midway ceased flying, Peters at all times understood that American was operating under a valid Bilateral Agreement with Midway, which fully supported American's acceptance of Midway's tickets. [9/8/97 Tr. at 79:8–81:3, 105:21–106:6 (Peters) ].

144. In the airline industry, when an interline partner ceases operations, the airline which carries the defunct airline's passengers holding tickets does so with the full right and entitlement to be paid under the interline agreement. [9/8/97 Tr. at 61:25–62:7, 80:8–81:3 (Peters); 9/9/97 Tr. at 41:18–42:19 (Peters) ].

145. Because American acted pursuant to the Bilateral Agreement and in accordance with industry custom and practice, American was entitled to be paid for transporting the Midway-ticketed passengers after Midway ceased operations. [9/9/97 Tr. at 118:1–10 (Zeko); 9/11/97 Tr. at 6:22–7:22 (Gunn) ].

146. Midway knew that American was transporting stranded Midway-ticketed passengers after Midway ceased operations. [9/16/97 Tr. at 37:21–38:11 (Thompson); American's Exhibit No. 132].

147. After November 13, 1991, no one representing Midway or the Trustee ever instructed American to stop flying Midway-ticketed passengers. [9/8/97 Tr. at 79:1–7, 79:21–25, 105:7–15 (Peters); 9/16/97 Tr. at 37:21–38:11 (Thompson) ].

148. Mark Hartmann from Midway never informed Jonathan Peters or anyone else at American that American should stop flying Midway-ticketed passengers. [9/8/97 Tr. at 105:12–15 (Peters) ].

## O. *American Issued Guidelines to Aid in the Transport of Midway Passengers*

149. Peters developed guidelines on behalf of American to aid in the transport of the stranded Midway-ticketed passengers and believed that those guidelines were fully in accord with the Bilateral Agreement. [9/8/97 Tr. at 78:17–80:7 (Peters); American's Exhibit Nos. 22, 23 and 24; Trustee's Exhibit No. 58].

150. There were no provisions in the Bilateral Agreement which prohibited the use of such guidelines. [9/8/97 Tr. at 74:4–8 (Peters) ].

151. Other airlines, including Northwest, TWA, Delta and U.S. Air, also carried Midway-ticketed passengers pursuant to such guidelines after Midway ceased operations in accordance with their interline agreements and industry custom and practice. [American's Exhibit Nos. 57, 133, 134, 200 and 201; Trustee's Exhibit No. 253].

152. While Midway was operational, there were many situations in which American would place guidelines upon the carriage of Midway passengers under the Bilateral Agreement. American and other airlines used these guidelines to ensure that they were able to carry traffic that was being rerouted to them from their interline partners. [9/8/97 Tr. at 73:19–74:3 (Peters) ].

153. The Trustee failed to establish that American's placement of guidelines on the transportation of Midway-ticketed passengers post-shutdown was contrary to the terms of the Bilateral Agreement.

154. Throughout airline bankruptcies of the late 1980's and early 1990's, all airlines having interline relationships with bankrupt airlines placed reasonable guidelines on the ticketed passengers to ensure the orderly transportation of those passengers on the carrying airline's flights. [9/8/97 Tr. at 106:7–18 (Peters) ].

155. Midway itself implemented guidelines for accepting Pan Am and Continental-ticketed passengers when those airlines filed for bankruptcy. [American's Exhibit Nos. 96 and 97].

156. After Midway ceased flying on November 13, 1991, American transmitted guidelines for transporting Midway-ticketed passengers to its field personnel. [9/8/97 Tr. at 78:17–25 (Peters); American's Exhibit Nos. 22, 23 and 24; Trustee's Exhibit No. 58].

157. American implemented these guidelines to ensure that American was able to accept the traffic without displacing its own customers and without causing difficulties for American's reservations and ticket agents. [9/8/97 Tr. at 81:17–23, 106:7–18 (Peters)].

158. The guidelines included regulating the dates by which American would accept Midway tickets for travel, the procedures for permitting passengers to exchange tickets and book advanced reservations, and the manner in which passengers holding free tickets who were in the process of traveling could get back home. [American's Exhibit Nos. 22, 23 and 24; Trustee's Exhibit No. 58].

159. On November 14, 1991, American adopted certain ticket acceptance guidelines (the "November 14 Guidelines") regarding the manner in which it would accommodate passengers displaced by Midway's cessation of operations. [American's Exhibit No. 22; Trustee's Exhibit No. 58].

160. On November 14, 1991, American required passengers displaced by Midway's cessation of operations to be reticketed on American within 24 hours of rebooking. This requirement caused congestion at O'Hare airport and at American's ticket offices as passengers holding Midway tickets sought to be accommodated by American within the time frame American had established. [Trustee's Exhibit No. 60].

161. Under the November 14 Guidelines, a passenger holding a Midway ticket for transportation on American could not change the itinerary absent a cancellation of the flight by American. [9/8/97 Tr. at 87:13–88:3 (Peters)].

162. Under the November 14 Guidelines, American agreed to accept free tickets (i.e., frequent flyer coupons, non-revenue employee passes) and other documents that would not ordinarily be accepted as valid interline tickets for transportation on American. [9/8/97 Tr. at 89:19–91:6, 94:1–96:7 (Peters)].

163. In contrast to tickets issued by Midway for transportation on Midway, American gave full face value to tickets issued by other airlines for travel on Midway under the November 14 Guidelines. [9/8/98 Tr. at 96:11–21 (Peters)].

164. K class is a discount, low revenue class of service in a coach cabin. [9/8/97 Tr. at 93:4–7 (Peters); 9/11/97 Tr. at 19:11–17 (Gunn)].

165. One of American's goals in limiting displaced Midway ticket holders to K class was protecting American's revenue exposure and its higher priced seat inventory from customers who paid American. [9/11/97 Tr. 20:9–16 (Gunn)].

166. Under American's November 14 Guidelines, if a passenger could not be accommodated in "K" class, American instructed its employees to charge the passenger the difference between the fare for K class and the fare for the available class of service regardless of the price of the Midway ticket. [9/11/97 Tr. at 6:4–7:8 (Peters)].

167. On November 15, 1991, American modified the November 14 Guidelines (the "November 15 Guidelines"). [Trustee's Exhibit No. 61].

168. The November 15 Guidelines stated that all passengers holding tickets issued by Midway, including first class passengers, would be accommodated by American in K class only on the originally intended travel date, and if K class was not available, the passenger could either book on the next date that K class was available or purchase an entirely new replacement ticket at a higher fare. [9/8/97 Tr. at 103:19–104:19 (Peters); 9/9/97 Tr. at 9:11–10:21 (Peters); American's Exhibit No. 24; Trustee's Exhibit No. 62 ("Psgrs must be protected in K inventory ... period") and 63].

**434**

169. The November 15 Guidelines also provided that Midway issued tickets would not be accepted as partial payment for an American ticket. [9/8/97 Tr. at 104:21–24 (Peters)].

170. Midway and the Trustee received written notice of American's guidelines. Neither Midway nor the Trustee objected to the use or imposition of such guidelines by American. [9/8/97 Tr. at 106:25–107:5 (Peters); American's Exhibit No. 132].

171. Midway and the Trustee also had knowledge that other airlines were flying its passengers after Midway suspended all operations. [9/16/97 Tr. at 37:21–25 (Thompson)].

172. American considered protecting its revenue exposure in deciding whether and how to accommodate passengers holding tickets issued by Midway. [9/9/97 Tr. at 26:11–18 (Peters)].

### P. *American's Transportation of the Midway Passenger After Midway's Shutdown Was Governed By the Bilateral Agreement*

173. The Trustee's contention that the procedures established in the Air Transport Association of America ("ATA") Standard Interline Passenger Procedures ("SIPP") Resolution 120.20 applied to American's transportation of Midway-ticketed passengers after shutdown and prohibited the placement of these guidelines is without any evidentiary support.

174. Involuntary rerouting, as the term is used in the airline business, describes a situation where the customer is being rerouted because of circumstances over which he has no control. [9/8/97 Tr. at 68:15–20 (Peters)].

175. There are three different types of involuntary rerouting. The most common type of involuntary rerouting is due to scheduling irregularities, such as flight cancellations or delays. [9/8/97 Tr. at 68:25–69:13 (Peters)].

176. The second type of involuntary rerouting occurs when a carrier decides to stop flying a specific market, perhaps even closing a city. This is generally referred to as a

"market exit." [9/8/97 Tr. at 69:15–69:22 (Peters)].

177. The third type of involuntary rerouting occurs when a carrier suspends its entire operation. [9/8/97 Tr. at 69:23–70:1 (Peters)].

178. American transported Midway-ticketed passengers who had previously purchased tickets from Midway prior to November 14, 1991 pursuant to the Bilateral Agreement that was assumed post-petition by Midway. Because American transported those passengers pursuant to the Bilateral Agreement, and did so in full accordance with industry custom and practice, it did not transport those passengers "voluntarily."

179. SIPP Resolution 120.20 applies only to scheduling irregularities. The resolution is for the rerouting of customers whose flights are interrupted on the day of departure and are rerouted from a single cancellation to other services. [9/8/97 Tr. at 70:19–72:19 (Peters); Trustee's Exhibit No. 22, § 1.6].

180. SIPP Resolution 120.20 does not apply to situations in which a carrier suspends its entire operation [9/8/97 Tr. at 72:9–12 (Peters)], and the Trustee presented no evidence to the contrary.

181. Similarly, SIPP Resolution 120.21 does not apply to situations in which an airline suspends its entire operation. The uncontroverted evidence is that SIPP Resolution 120.21 applies only to strike situations. [9/9/97 Tr. at 38:16–41:2 (Peters)].

182. Although Section IV of the Bilateral Agreement provides that "[t]he parties agree that they will adhere to the procedures established in ... SIPP Resolutions 120.20 and 120.21, as then in effect, with respect to *involuntary rerouting of passengers*," (emphasis added) the unrefuted evidence is that SIPP Resolution 120.20 pertains only to involuntary rerouting involving schedule irregularities. [9/8/97 Tr. at 70:19–72:19 (Peters); Trustee's Exhibit No. 22; American's Exhibit No. 6, § 4.1; Trustee's Exhibit No. 1, § 4.1].

183. Moreover, a review of SIPP Resolution 120.20 confirms that on its face it only applies to schedule irregularities. Although

the Resolution is generally entitled "Involuntary Rerouting of Passengers," it provides procedures for "schedule irregularities" and defines such irregularities as meaning any one of the following: "(a) Delay in the scheduled departure or arrival of a Member's flight resulting in a misconnection, or (b) Flight cancellation, omission of a scheduled stop, or any other delay or interruption in the scheduled operation of a Member's flight, or (c) Substitution of equipment of a different class of service, or (d) Schedule changes which require rerouting of passenger at departure time of the original flight." [Trustee's Exhibit No. 22, § 1.6].

184. A carrier's complete shutdown of flight operations falls outside of the definition of "schedule irregularity" because there are no scheduled flights for a carrier who ceases operation. Moreover, the fact that a member was to "provide onward transportation ... on the first flight(s) on which space is available and which will provide the earliest arrival at the passenger's destination or point of stopover" could not possibly apply to a Midway-ticketed passenger holding a ticket specifying travel three months after Midway ceased operations. [Trustee's Exhibit No. 22, § 3.3].

185. American's transportation of involuntarily rerouted Midway passengers after Midway's shutdown was governed solely by the Bilateral Agreement, as SIPP Resolutions 120.20 and 120.21 did not apply to Midway's cessation of operations.

**Q. American Did Not Fly Midway's Passengers for Marketing Reasons**

186. Contrary to the Trustee's contention, American did not fly Midway-ticketed passengers after Midway ceased operations for marketing reasons. [9/11/97 Tr. at 6:10–7:22 (Gunn)].

187. Michael Gunn, Senior Vice President of Marketing at American for the past eleven years, testified that there was no American marketing plan with regard to transporting the Midway-ticketed passengers. [9/11/97 Tr. at 5:2–6, 6:18–21 (Gunn)].

188. Gunn, who was involved in all marketing plans at American, had no involvement with the decision to fly the Midway-ticketed passengers. Instead, Gunn believed that the Bilateral Agreement between the airlines governed American's decision to fly the stranded Midway ticketholders. [9/11/97 Tr. at 6:1–17 (Gunn)].

189. The interline function is not within the marketing department at American. [9/11/97 Tr. at 14:20–15:4 (Gunn)].

190. American expected to be paid for carrying the Midway-ticketed passengers. There was no decision at American to fly these passengers for free to gain market share in Chicago. [9/11/97 Tr. at 6:22–7:15 (Gunn)].

191. Gunn testified that there is no benefit to American in merely filling empty seats on its planes in the hopes of increasing American's market share in Chicago. According to Gunn, "if [American] is being paid for it, there is a clear benefit. But to fill [the seats] with free customers really just detracts from the level of service [American] would provide to paying customers. So it's actually just contrary. It's a detriment." [9/11/97 Tr. at 7:18–22 (Gunn)].

192. The Trustee failed to present any evidence that American promulgated guidelines to transport the Midway-ticketed passengers in direct response to how United Airlines was transporting Midway-ticketed passengers. [9/8/97 Tr. at 81:4–23 (Peters); 9/9/97 Tr. at 58:2–59:24 (Peters)].

193. The Trustee has no evidentiary support for his argument that American flew Midway's passengers for free in order to compete with United Airlines and gain market share in Chicago.

194. The only time the marketing department at American became involved with Midway post-cessation occurred when Midway approached American to see if American was interested in acquiring certain Midway assets after Midway's bankruptcy case converted to a Chapter 7 case. The assets in question were Midway's list of frequent flyer participants and the list of senior travelers. [9/11/97 Tr. at 7:23–8:13 (Gunn)].

195. American decided to bid only $100,000.00 for the frequent flyer list. When United Airlines bid $150,000.00, American

decided not to increase its bid above $100,-000.00. [9/11/97 Tr. at 8:14–9:1 (Gunn); American's Exhibit No. 54].

196. American also had some interest in Midway's senior travelers list. [9/11/97 Tr. at 7:23–9:12 (Gunn) ].

197. American offered to fly Midway Seniorsfirst coupon holders for $25.00 per one-way trip. [9/11/97 Tr. at 9:4–12 (Gunn); Trustee's Exhibit No. 69].

198. The Trustee requested American to honor its Seniorsfirst coupons in order to reduce the risk that these customers would seek credit card refunds. [American's Exhibit No. 53, Motion for Approval of Agreement with American Relating to Seniorsfirst Senior Citizen Coupons, ¶ 6].

199. American agreed to honor the Seniorsfirst coupons in exchange for receiving access to the names and addresses of the participants in the Seniorsfirst program and agreed to carry the customers at $25.00 per segment. [*Id.* at ¶ 10; 9/11/97 Tr. at 7:23–9:12 (Gunn) ].

200. American's December, 1991 agreement with the Trustee to purchase assets relating to the Seniorsfirst program was a separate and distinct transaction from the carriage of Midway-ticketed passengers. [9/11/97 Tr. at 7:23–9:12 (Gunn) ].

201. American believed that transporting Midway's Seniorfirst coupon holders would further its objective of increasing its market share in Chicago. [9/11/97 Tr. at 14:2–8 (Gunn) ].

202. By transporting Midway's stranded passengers, American provided significant benefits to the Midway Estate. Midway had already collected the funds from its ticketed passengers to whom it owed corresponding liability to refund or fly them, and had failed to carry out its obligations to fly the ticketed passengers. American, in providing those services, carried out Midway's obligations and is entitled to be paid pursuant to the Bilateral Agreement.

**R.** *American Continued to Bill Midway After it Ceased Operations in the Ordinary Course of Business*

203. On November 27, 1991, the ACH informed American and Midway by teletype

and letter that "services of the Clearing House shall remain available to Midway Airlines and that [Midway] may participate in subsequent settlements unless you are subsequently notified otherwise." [American's Exhibit No. 26]. Zeko understood this to mean that American would continue submitting its monthly billings to Midway through the ACH. [9/9/97 Tr. at 119:12–120:17 (Zeko) ].

204. As late as December 9, 1991, the ACH informed American and Midway by teletype and letter that American's claims against Midway through April, 1992 could be cleared through the ACH:

the Services of the Clearing House shall remain available to Midway Airlines and . . . future claims by/against it covering the period November 1991 through April 1992 may be presented for settlement through the Clearing House.

[9/9/97 Tr. at 120:18–122:12 (Zeko); American's Exhibit No. 135].

205. In accordance with these ACH communications, American continued to make submissions to the ACH for services rendered to Midway, including the transportation of displaced Midway-ticketed passengers after Midway's shutdown. [Joint Pretrial Statement, Uncontested Facts, ¶ 24].

206. In keeping with ACH procedures, American submitted its November, 1991 billings against Midway's account to the ACH in December, 1991. [9/9/97 Tr. at 122:13–123:12 (Zeko) ].

207. The industry custom and practice is to continue to bill a carrier for lifting or exchanging that carrier's tickets, even if that carrier has ceased operations. [9/9/97 Tr. at 117:12–21 (Zeko) ].

208. Although Zeko knew sometime after December 9, 1991 that Midway had a $775,-000.00 credit left over in the clearinghouse from October transactions, Zeko's assumption was that like any other ACH member, Midway would deposit the funds to satisfy any debtor position by the 28th of December for the November clearing month. Zeko was unaware that Midway was not going to have those funds available at the time he wrote a

note on the December 9, 1991 clearinghouse memo. [9/11/97 Tr. at 29:16–30:24 (Zeko) ].

209. The ACH had procedures in place with respect to the time frame in which carriers were required to clear accounts through the ACH after a carrier ceases operations. Specifically, in the event a carrier ceased operations, other carriers would be able to settle with that carrier through the clearinghouse for six months subsequent to the date of shutdown. Paragraph 10(c) of the settlement agreement executed by all carriers with the ACH, provided for the additional six-month period in which to clear accounts:

> If any airline shall cease to operate scheduled air carrier services and such Airline is not otherwise in default of its obligations hereunder, this Agreement shall terminate with the final settlement on the sixth transaction month after cessation of scheduled services, including the month in which service ceased.

[9/11/97 Tr. at 31:20–34:13 (Zeko); American's Exhibit No. 50, Agreement Relating to the Settlement of Interline Accounts through the ACH, p. 8, ¶ 10.(c) ].

210. The ACH Manual of Procedure Section 8.1 similarly provides for a six-month period for the settlement of accounts after a carrier's cessation of operations or withdrawal from the ACH. [9/11/97 Tr. at 34:5–13 (Zeko) ].

211. The ACH Manual of Procedure Section 8.1 does not address the ACH's required six-month rejection period. [9/11/97 Tr. at 34:5–13 (Zeko) ].

212. The rejection provisions of the ACH are found in Section C.7 of the ACH Manual entitled "Adjustments/Rejection/Rebilling Rules and Time Limits." [American's Exhibit No. 210].

213. Zeko testified without refutation that the language of Section 8.1 referring to "transactions effected prior to the effective date of cessation" meant that any transactions or tickets issued prior to the carrier's cessation or withdrawal from the clearinghouse that were lifted or exchanged by an interline partner would be settled through the clearinghouse for six months subsequent to the time of cessation. [9/11/97 Tr. at 35:2–36:14 (Zeko) ].

214. The Trustee's witness, Sue Thompson, echoed this interpretation when responding to the ACH's December 9, 1991 communication that the clearinghouse will remain open for claims by/against Midway through April 1992. She wrote "a great deal of the claims are for transactions through 4/92 only." [9/16/97 Tr. at 40:11–41:20 (Thompson); American's Exhibit No. 135].

215. In late December, 1991, Midway was suspended from the ACH. *See* Underlying Material Background Facts for All Counts of the Complaint, ¶ 50.

216. After Midway was suspended from the ACH, American submitted summary invoices, detailed ticket listings and original flight coupons for the December, 1991 through April, 1992 clearing months directly to Midway (through the Trustee), pursuant to Section 1.11(iii) of the Bilateral Agreement, and in accordance with industry custom and practice. [9/9/97 Tr. at 122:18–124:6 (Zeko) ].

217. American continued to bill Midway in exactly the same way as it has had while Midway was still a member of the ACH—"[s]ame invoice, same invoice methodology, same procedures." [9/9/97 Tr. at 122:22–123:2 (Zeko) ].

218. Midway audited American's ACH submissions on a ticket-by-ticket basis for the period of November 14, 1991 through the conversion of Midway's bankruptcy case to Chapter 7. [Midway's Answer to Request to Admit No. 9].

**S.** *Midway's Ticket Sales by Credit Card*

219. The Midway Estate also received significant benefits after the November 27, 1991 conversion to Chapter 7 in the form of payments from credit card companies/processors for deposits and set asides. [9/15/97 Tr. at 21:17–22:1, 23:23–24:8, 25:15–23 (Brosseau) ].

220. Credit card sales constituted the greatest portion of Midway's total ticket sales. Nearly 75% of Midway's ticket sales were generated through credit cards. As of

1991, Midway accepted American Express, Visa, MasterCard, enRoute and Diners Club, as well as the credit cards issued by their licensees, affiliates and franchisees. [American's Exhibit No. 44, Midway's Motion to Assume Credit Card Agreements, ¶ 4].

221. Midway had agreements directly with travel and entertainment cards, such as American Express and Diners Club, and through a credit card processor such as First Bank for bank cards such as Visa and MasterCard. [9/15/97 Tr. at 14:3–17:17 (Brosseau)].

222. Midway was permitted to assume its agreements with a number of credit card companies on March 27, 1991. Assumption of these agreements allowed Midway to continue to allow passengers to purchase tickets with credit cards and allowed Midway to be reimbursed for the price of the ticket shortly thereafter. [Joint Pretrial Statement, Uncontested Facts, ¶ 13].

223. Midway's agreements with the credit card companies/processors required Midway to make certain deposits totaling millions of dollars and also permitted the credit card companies/processors to establish set-asides or hold backs in the event of a Midway shutdown or Chapter 7 conversion. [9/15/97 Tr. at 19:13–21:16, 22:2–23:6, 24:9–25:14 (Brosseau); American's Exhibit Nos. 93, 99 and 101].

224. The reason for these deposits and set-asides was to ensure that the credit card companies would be reimbursed by Midway if they extended credit to Midway's passengers for the purchase of Midway tickets and the passengers later sought a refund or refused to pay for their tickets because Midway had ceased operations. [9/15/97 Tr. at 17:18–18:17 (Brosseau)].

225. According to James Brosseau—an expert in the operational relationships between credit card companies and airlines who was involved with credit card issues at American for 31 years—set-asides or hold backs are used in situations where an airline appears financially unstable. In such situations, the credit card companies assess the risks which they may face if the airline stops flying. For example, the companies evaluate their risk of being inundated with cardholders refusing to pay for tickets or requests for refunds for tickets that cannot be used. [9/15/97 Tr. at 6:10–9:10, 17:18–18:17 (Brosseau); American's Exhibit No. 166].

226. The credit card companies/processors then evaluate the financial situation of the unstable carrier, determine what portion of that carrier's outstanding sales pertain to its particular credit card, and then negotiate with the airline for the set-aside or the reserve should the airline go bankrupt. [9/15/97 Tr. at 18:11–17 (Brosseau)].

227. When the credit card companies/processors determine that the risk of exposure to refund claims or nonpayment no longer exists, they pay the set-aside or reserved monies back to the carrier. [9/15/97 Tr. at 18:18–19:1 (Brosseau)].

228. When Midway ceased operations, those passengers who had charged the cost of their Midway tickets with a credit card could refuse to pay the credit card companies/processors for the price of the tickets because Midway was unable to provide the agreed upon service—it could not fly its passengers. If this occurred, the credit card companies would seek reimbursement from Midway for the price of the tickets. The deposits and set-asides agreed to by Midway ensured that there would be sufficient funds available for the credit card companies/processors to be reimbursed by Midway. [9/15/97 Tr. at 17:18–19:1, 25:24–26:22 (Brosseau)].

229. There were large occurrences of chargebacks and refunds with respect to Midway's credit card accounts after November 13, 1991 because Midway ceased operations. [9/18/97 Tr. at 11:18–22 (Thompson)].

230. In April, 1991, Midway and American Express amended their agreement to provide for a $3.4 million deposit to protect American Express from risk due to Midway's financial instability. [American's Exhibit No. 101, ¶ 3(a)]. In addition, the agreement provided that American Express could supplement the reserve if Midway ceased operating or if Midway's Chapter 11 case was converted to a Chapter 7 case. [9/15/97 Tr. at 21:4–9 (Brosseau); 9/18/97 Tr. at 24:9–25:1

(Thompson); American's Exhibit No. 101, ¶ 3(b) ].

231. In November and December of 1991, American Express increased Midway's reserve to an amount substantially higher than $3.4 million by virtue of substantial hold backs. [9/15/97 Tr. at 21:10–16 (Brosseau); 9/18/97 Tr. at 25:21–26:4 (Thompson); American's Exhibit Nos. 144 and 147].

232. Midway's agreement with First Bank Services provided for a set-aside of $10.9 million for the period from February 1991 through June 1991. [American's Exhibit No. 99, Schedule 3 at ¶ 1]. Midway deposited the full amount of this set-aside with First Bank Services. [9/15/97 Tr. at 22:13–23:22 (Brosseau); American's Exhibit Nos. 63, 89 and 211].

233. Furthermore, Midway's agreement with Diners Club permitted Diners Club to discontinue payments of Midway's invoices in the event that Midway filed for bankruptcy. [American's Exhibit No. 93]. When Midway filed for bankruptcy, Diners Club held back Midway's monies pursuant to the agreement. [9/15/97 Tr. at 24:9–25:14 (Brosseau) ].

234. Because American transported Midway-ticketed passengers after November 13, 1991, a significant number of passengers did not seek a refund from their credit card companies/processors because they were able to use their Midway tickets on other airlines. In turn, the credit card companies/processors did not need to seek reimbursement from the Midway Estate for such tickets. Because their risk of exposure had passed, the credit card companies/processors paid the money to the Midway Estate. [9/15/97 Tr. at 26:4–27:2 (Brosseau) ].

235. In Brosseau's opinion, Midway received payments from its credit card companies/processors in the form of deposits and set asides after November 27, 1991 in an amount exceeding $15.2 million—in excess of $6.5 million from First Bank, in excess of $7.4 million from American Express, and in excess of $1.3 million from Diners Club as a result of American (and to a lesser extent other airlines) transporting the Midway-ticketed passengers. [9/15/97 Tr. at 21:17–22:1, 23:23–24:8, 25:15–26:2 (Brosseau); American's Exhibit Nos. 144, 146, 147 and 211].

236. Although Brosseau testified that Midway received certain refunds from credit card processors he had no knowledge of whether the "refunds" were given on account of all or any portion of the passengers flying on American. [9/15/97 Tr. at 31:1–15 (Brosseau) ].

237. Although Brosseau is of the opinion that some of the passengers who exchanged Midway tickets for American's tickets never flew [9/15/97 Tr. at 31:1–32:16 (Brosseau) ], because American destroyed the records from its ticket inquiry system [9/15/97 Tr. 33:6–34:25 (Brosseau) ], which would have enabled it to track ticket usage, American does not know what portion of exchanged tickets were used and what portion received refunds from Midway or its credit card processors.

238. American introduced no evidence regarding the number of Midway ticket holders accommodated by other airlines, so the Court has no documented record of the percentage of credit card refunds that was attributable to other airlines' behavior.

239. The Trustee has conceded that because American transported Midway's passengers from November, 1991 through April, 1992, Midway-ticketed passengers who were transported did not seek to cancel their obligations to pay their credit card companies for the price of their tickets. [Midway's Answer to Request to Admit No. 25; 9/18/97 Tr. at 11:23–12:11 (Thompson) ]. *See also* American's Exhibit No. 53, Motion for Approval of Agreement with American Relating to Seniorsfirst Senior Citizen Coupons, ¶ 6.

240. Thompson's testimony disagreeing with Brosseau's testimony on the amounts paid by credit card companies to the Midway Estate after November 27, 1991 (while setting a floor of at least $5.6 million) was not as credible because of a lack of supporting documentation in the evidence supporting Thompson's recollection. Nor did Thompson exhibit any expertise in the credit card area. [9/18/97 Tr. at 17:22–18:10 (Thompson) (no understanding of the term "redemption"); 9/16/97 Tr. at 17:20–25 (Thompson) ("I only

*recall* receiving two payments from First Bank")].

241. Redemptions by credit card processors did not necessarily mean that Midway received funds; rather, redemptions occurred when money was moved from one Midway account to another as well as when cash was paid to Midway. [9/18/97 Tr. at 20:2–24:20, 28:3–29:7 (Thompson)].

242. American did not contact any credit card processor to determine what amounts, if any, were actually refunded to Midway and the reason for such refunds. [9/15/97 Tr. at 36:11–37:13 (Brosseau)].

### T. *American Failed to Meet Its Burden of Proof on the Amount of Some of Its Claims*

243. American did not prove its total Claims and requests for administrative expenses by a preponderance of the credible evidence in the aggregate amount of $15,-925,849.15.

### (i) *Passenger Transportation Services*

244. American did not prove the total amount of the component of its Claims for passenger transportation services by a preponderance of the credible evidence. [American's Exhibit No. 2].

245. The Trustee concedes that American is entitled to a Chapter 11 administrative claim for passenger transportation services provided for the period November 1, through November 13, 1991.

246. Ms. Thompson computed the value of these services to be $461,736.00. [9/18/97 at 5:4–7:20 (Thompson)].

247. American's submissions to Midway for passenger transportation services during the relevant time were prepared under the direction of Mark Zeko. [9/9/97 Tr. at 101:8–13 (Zeko)].

248. For the period November, 1991 through April, 1992, American prepared its summary invoices and detailed ticket listings to Midway purportedly in accordance with both ACH procedures and the Bilateral Agreement. [9/9/97 Tr. at 122:13–124:14 (Zeko)].

249. American has supported the passenger transportation component of its Claims using the same types of documents—summary invoices, detailed ticket listings and original flight coupons—and the same methodology that Midway recognized was sufficient to support payment while Midway was operational. American claims that the methodology used was all in accordance with the ACH Manual of Procedure, the Bilateral Agreement and industry custom and practice. [9/9/97 Tr. at 122:22–124:14 (Zeko)].

250. Mark Zeko and Gordon Nelson testified in support of the preparation and accuracy of American's Claims. Zeko, Manager of Passenger Interline Billing of American from 1978 to 1995 and former President of the ACH, testified that American's submissions to Midway for passenger transportation services for the past several years were prepared under his direction and in accordance with industry custom and practice, the ACH Manual of Procedure and the Bilateral Agreement. [9/9/97 Tr. at 101:8–13, 129:10–130:23 (Zeko)]. Zeko concluded that American's summary invoices and detailed ticket listings submitted to Midway for the period November 1991 through April 1992 were accurate. [9/9/97 Tr. at 129:10–130:23 (Zeko); American's Exhibit Nos. 18, 27, 32, 34, 35 and 37].

251. Neither Zeko, Nelson, nor any other witness had personally reviewed or directed the review and auditing of all relevant documentation underlying American's Claims. [American's Exhibit Nos. 38–43]. This is fatal to a proper definitive amount to be found and allowed by the Court at this time.

252. American did not undertake any audit of the pricing of exchanged tickets billed to Midway. It is precisely due to the lack of a full review and audit of the Claims of American by it, or by the Trustee, or any individual or staff of knowledgeable auditors that the Court is unable to definitely allow the appropriate amount of American's passenger transportation Claims.

253. American did not attempt to verify whether passengers who exchanged their tickets and for whom American sought pay-

ment in its Claims actually ever flew. [9/11/97 Tr. at 99:17–100:10 (Nelson)].

254. American destroyed the documents (including the data in American's ticket inquiry system) necessary to determine whether the passengers who exchanged Midway tickets for American's tickets after November 13, 1991 were actually flown on American aircraft. [9/15/97 Tr. at 33:6–34:25 (Brosseau); 9/11/97 Tr. at 100:3–10 (Nelson)].

255. American knew at the time that it filed the Claims that the Barbados data processors had not been told to price tickets at coupon value, and American took no steps to determine whether the Barbados data processors had been given any special instructions regarding accuracy of Midway ticket prices. [9/11/97 Tr. 100:19–101:11 (Nelson)].

256. After American submitted billings to Midway (through the ACH or otherwise), American took no steps to further audit those tickets. [9/11/97 Tr. at 67:25–68:11 (Nelson)].

257. American priced the lift transactions in full accordance with its methodology used at the time for all non-sampling airlines. The flight coupons were sent to a location in Barbados to be keypunched for data entry into a database that had been loaded with published fare information for all airlines. The electronic database was comprised of software that was purchased from United Airlines in the 1970's. This pricing logic software took information keypunched from the flight coupons and priced the tickets according to the published fare information that was in the computer database, rather than the price information contained on the face of the lifted tickets themselves. This electronic database has been used by American to price all lifts and exchanges for non-sampling airlines from the 1970's until today. [9/9/97 Tr. at 101:19–103:16 (Zeko)].

258. Throughout Zeko's tenure as Manager of Passenger Interline Accounting at American, he never received any complaints from any airlines as to American's pricing of passenger transactions. This includes annual industry meetings attended by Midway personnel who never complained about American's billing system. [9/9/97 Tr. at 103:17–104:16 (Zeko)].

259. While Midway was operational, American never received any complaints as to its pricing computer model from Midway. [9/9/97 Tr. at 104:12–16 (Zeko)].

260. Prior to this litigation, after Midway ceased operations, American never received any complaints from either Midway or the Trustee with respect to American's pricing model. [9/9/97 Tr. at 104:22–25 (Zeko)].

261. The only change in methodology from ordinary course of business utilized by American in billing Midway for the period November, 1991 through April, 1992 was that American manually priced all exchange transactions (but not the lifts) to match the face value of the coupon instead of using American's electronic database to price the coupons. American did so at the direction of Mark Zeko. He had a concern about the potential for human error due to the extremely heavy volume of exchanges occurring in November and December 1991 as well as the fact that exchanges involve multiple coupon transactions and city pairs that were not usually the same as American's city pairs. [9/9/97 Tr. at 124:7–126:18 (Zeko)].

262. American did not reprice the lift transactions because Zeko did not have the same concerns with lifts as he had with exchanges. Lifts or revalidations basically involve the same city pairs that are flown by American, which meant that those fares should have existed in American's electronic database. There was no proof at trial, however, to establish this fact. American had been using its pricing logic software for years and did not experience any problems with it. Finally, the volume problems associated with exchanges did not apply to the lifts in Zeko's opinion. [9/9/97 Tr. at 127:1–128:12 (Zeko)].

263. American never billed Midway for exchange transactions at the system generated price for the November, 1991 through April, 1992 period. [9/9/97 Tr. at 126:19–24 (Zeko)].

264. Gordon Nelson, who was the supervisor of passenger interline accounting at American during the relevant time period,

has 15 years experience working with the submissions of billings to other airlines and prepared the figures in the second amended proof of claim. [9/11/97 Tr. at 72:9–73:22 (Nelson)].

265. Nelson utilized the summary invoices submitted through ACH and directly to Midway and the Trustee, and detailed ticket listings for the period November, 1991 through April 1992, to prepare the second amended proof of claim after having determined that those invoices were submitted to Midway during that period of time and remained unpaid. [9/11/97 Tr. at 74:7–75:5 (Nelson)].

266. Nelson did not review the individual flight coupons in preparing the second amended proof of claim because he believed he had a complete understanding as to how the tickets "roll up" to the detailed ticket listings, which in turn "roll up" to the summary invoices. He fully understood how the summary invoices were prepared at the time they were submitted to Midway. [9/11/97 Tr. at 76:4–14 (Nelson)].

267. In preparing the second amended proof of claim, Nelson made a few adjustments to the figures derived from the summary invoices to ensure that they were accurate. First, he removed Midway's November 1991 submission for passenger transportation of $207,217.00 because those charges had already been netted out of American's Claim during the ACH clearing process for the month of November. [9/9/97 Tr. at 133:20–139:5 (Zeko); 9/16/97 Tr. at 87:17–24 (Thompson); American's Exhibit No. 31]. Second, he removed $547,890.00 representing monies that were already paid to American in the December, 1991 ACH partial recast to partially satisfy the debt owing American from Midway for the month of November. [9/11/97 Tr. at 76:15–77:23 (Nelson)]. Finally, he deducted almost $88,000.00 at the direction of counsel, which reflected the Trustee's computation of the value of tickets improperly billed by American to Midway on or after November 1, 1991. [9/11/97 Tr. at 76:15–77:23 (Nelson); Trustee's Exhibit No. 248].

268. Nelson testified in conclusion that the second amended proof of claim is accurate. [9/11/97 Tr. at 77:25–78:2 (Nelson)].

269. A number of tickets for transactions in November, 1991 that the Trustee's staff reviewed contained instances of American's overpricing or improper billing; tickets that weren't Midway tickets; double billing; zero value coupons like frequent flyer tickets and similar tickets of that nature that were being billed at large prices; and passenger receipts—coupons that were not really valid tickets. [9/16/97 Tr. at 9:7–17 (Thompson)].

270. American overpriced other Midway tickets for which it received payment in the ACH partial recast as well. [9/10/97 Tr. at 22:8–24:15, 29:16–30:7 (Zeko); Trustee's Exhibit Nos. 108, 109, 118, 119, 275 and 276].

271. Among the tickets that American accepted and billed to Midway during November, 1991 were free tickets for which Midway received no revenue and had no expectation of payment from the customer. [*See, e.g.,* Trustee's Exhibit Nos. 96, 97 and 303–306].

272. American also accepted non-tickets such as passenger receipts and billed Midway for its acceptance of these documents. [*See, e.g.,* Trustee's Exhibit Nos. 98–103, 301 and 302].

273. Moreover, American did not bill Midway for the K class of service which it provided to displaced Midway passengers; it billed Midway for a higher class of service. [*See, e.g.,* Trustee's Exhibit Nos. 182–199 and 286–291].

274. American billed Midway for American's transactions with other airlines. [*See, e.g.* Trustee Exhibit Nos. 122–141, 299 and 300].

275. American double billed Midway for individual transactions, [*See, e.g.,* Trustee's Exhibit Nos. 146–155 and 294–298] as well as in some instances for entire batches of tickets. [*See, e.g.,* Trustee's Exhibit Nos. 147, 148, 292 and 293].

276. American's computer program caused American to bill Midway amounts as high as $604.55 for a leg of transportation for which the customer paid Midway only $45.45. [9/9/97 Tr. at 147:10–150:16 (Zeko); Trustee's

Exhibit No. 104]. American billed Midway $550.15 for that ticket, which was a lift transaction. [9/9/97 Tr. at 150:17–152:11, 164:16–23 (Zeko); Trustee's Exhibit No. 105].

277. American was credited with $550.15 rather than $45.45 on account of Trustee's Exhibit 105 in the ACH partial recast, as American submitted that ticket in the December 19 billing. [9/10/97 Tr. at 9:14–17 (Zeko)].

278. American billed Midway for tickets which American exchanged for American's tickets and for which American refused to provide a refund when the passenger elected not to fly. Rather, American instead directed such passengers to Midway for a refund. [9/10/97 Tr. at 62:9–74:9 (Zeko); Trustee's Exhibit Nos. 200, 202–204, 210, 214–216 and 218; American's Exhibit No. 60].

279. Double billing is impermissible under the ACH rules and the above examples of overpricing raise substantial questions as to its extent and the resulting amount of inflated billings by American to Midway among the subject interline billings. [9/11/97 Tr. at 110:25–111:5 (Zeko)].

280. The Trustee claims that American is not entitled to recover for any of the subject exchange transactions (as opposed to lifts) because American did not prove that the Midway-ticketed passengers flew on American after exchanging those tickets.

281. As previously found, in accordance with industry custom and practice and ACH procedure, Midway became liable to American for the exchange transactions at the time of the exchange. On exchange transactions, the ticketing carrier's liability shifts to the carrier who issues its own ticket at the time of the exchange regardless of whether or not the passenger is ultimately flown.

282. Moreover, in accordance with industry custom and practice and ACH procedure, the transporting airline bills its interline partner for an exchange transaction in the month the ticket is exchanged, not when the new ticket is ultimately used by the customer. Thus, evidence that the carrying airline exchanged the ticket in the form of (1) the summary invoice; (2) the detailed ticket listing; and (3) the original flight coupons ex-

changed supported American's request for payment.

283. The guidelines promulgated by Peters anticipated that the bulk of the transactions would be lifts as opposed to exchanges after Midway ceased operations. [9/9/97 Tr. at 18:2–10 (Peters)]. There is no evidence that American preferred an exchange transaction as opposed to a lift transaction.

284. There is no evidence that American had a policy of exchanging tickets as opposed to lifting tickets following Midway's cessation of operations for any financial or other purpose.

285. In late 1991, upon evaluation of the large number of exchanges, Peters concluded the increased number of exchanges may have resulted from customer pressure on American's agents by people no longer wanting to hold Midway tickets. [9/9/97 Tr. at 18:11–25 (Peters)].

286. The Trustee initially directed his staff to separate all the coupons into two groups: those specifying travel on or before November 13, 1997 and those specifying travel on November 14, 1991 and after. [9/16/97 Tr. at 69:25–71:3 (Thompson)].

287. The Trustee reviewed all coupons specifying travel for the period November 1—November 13 for alleged improper billing and quantified that figure at $72,419.00. [Trustee's Exhibit No. 248]. American removed this alleged improper billing from its second amended proof of claim. [9/11/97 Tr. at 77:19–21 (Nelson); American's Exhibit No. 2].

288. The Trustee also identified instances of alleged improper billing for the November 14 and later time period that was identified by the Trustee's staff during the separation process. The Trustee quantified that figure at $15,407.00. [Trustee's Exhibit No. 248]. American removed this alleged improper billing from its second amended proof of claim. [9/11/97 Tr. at 77:19–21 (Nelson); American's Exhibit No. 2].

289. Sue Thompson was charged by the Trustee with reviewing American's Claims.

290. Thompson became Midway's Acting Director of Revenue Accounting in Au-

444

gust/September 1990 and prior to that had no experience working in the airline industry. [9/16/97 Tr. at 33:24–34:19 (Thompson)].

291. Thompson performed a sample exercise on an undetermined number of November and December, 1991 tickets specifying travel on or after November 14, 1991. This testimony, however, was not conclusive to prove a continuing system-wide over billing problem in the American pricing system.

292. Thompson undertook this exercise in mid–1997, over a year after the Complaint was filed in preparation for trial. [9/16/97 Tr. at 63:22–64:8 (Thompson)].

293. There was no written protocol, no randomly selected sample, no reduction of the analysis to writing, and no attendant work papers for the sample exercise. More specifically:

- The Trustee's staff began examining batches of November tickets and stopped "about halfway through" when these tickets were subpoenaed for trial. Thompson does not know how many tickets were examined. [9/16/97 Tr. at 65:14–66:18 (Thompson)].

- The Trustee's staff examined a "few percent" of tickets in December. Thompson, however, does not know which tickets. [9/16/97 Tr. at 66:19–67:10 (Thompson)].

- The sampling exercise took place at the direction of the Trustee without any written protocol. [9/16/97 Tr. at 67:21–23, 71:10–13 (Thompson)].

- No statistical methodology was used to select the tickets reviewed. No table of random numbers was employed and no statistician was used to select the sample. [9/16/97 Tr. at 71:18–73:16 (Thompson)].

- No outside, independent third party was used to conduct the analysis. [9/16/97 Tr. at 73:17–74:4 (Thompson)].

- No statistical procedures were used that could extrapolate the sample's findings to any other population of tickets. [9/16/97 Tr. at 75:21–76:3 (Thompson)].

- No margin of error was calculated. [9/16/97 Tr. at 76:11–19 (Thompson)].

- No documentation exists that reflects the Trustee's analysis of alleged overpricing post-November 13. [9/16/97 Tr. at 77:21–78:7 (Thompson)].

- American was never provided any documentation that reflected the analysis or results of the Trustee's sampling exercise. [9/16/97 Tr. at 79:2–9 (Thompson)].

294. Because the sampling and analysis of relatively few of the subject flight coupons was not performed in a manner consistent with generally accepted techniques of social scientists and statisticians does not mean, however, that therefore American's Claims must be allowed in the requested amount. The Court finds that the Trustee's evidence raised a sufficient question as to the accuracy of the revised amounts requested by American to warrant a full audit of the subject items, so that the Court can make the appropriate finding of precisely how much of American's Claims should be allowed and given Chapter 7 administrative priority and Chapter 11 administrative priority status, respectively.

295. Of the tickets admitted into evidence which the Trustee claims are improper billings, there is no evidence that those tickets were ever billed intentionally by American or that American certainly knew of the errors prior to submitting its Claims to the Midway Estate. [9/9/97 Tr. at 130:13–22 (Zeko)].

296. Zeko testified that a number of the improper billing examples raised by the Trustee are nothing more than keying errors that he was not aware of at the time the invoices were submitted to Midway. [9/10/97 Tr. at 13:9–14:10, 35:13–18 (Zeko)].

297. A portion of tickets claimed to be improper billings have already been removed from American's second amended proof of claim. Those include Trustee's Exhibit Nos. 96, 98, 102, 104, 122, 124, 126, 128, 130, 132, 134, 138, 140, 148, 152, 154, 159, 163, 166, 169, 170, 171, 173 and 297.

298. To the extent the Trustee made an analysis as to alleged improper billings, that analysis was claimed by American to be in error. For example, the Trustee claims that Trustee Exhibit No. 102 represents a situa-

tion where American billed Midway for a fraudulent ticket. Zeko testified that this was a validly billed transaction. [9/10/97 Tr. at 36:12–39:4 (Zeko) ].

299. Neither the Trustee nor American audited each of the approximate 150,000 coupons that comprise the passenger transportation component of American's Claims.

300. The Court lacks both the expertise and staff to do the audit needed to properly establish the correct amount that should be allowed for American's passenger transportation component.

### (ii) *Ground Handling Services and Non–Transportation Services*

301. American seeks payment for non-transportation services it provided and the ground handling services provided by AMR Services Corporation post-petition in the amounts of $337,910.97 and $58,677.37 respectively.

302. American proved its administrative claim for non-transportation services in the amount of $337,910.97 by a preponderance of the evidence. [American's Exhibit No. 3].

303. Other than an unsupported statement by Ms. Thompson that no more than around $150,000.00 of this component of the Claims was proper (after netting out Midway's November 1991 non-transportation claim), no other evidence is in the record to support the Trustee's analysis for rejecting approximately $183,000.00 of this component of American's Claims. [9/16/97 Tr. at 19:18–21:2 (Thompson); Trustee's Exhibit No. 248].

304. American proved its administrative claim for ground handling services in the amount of $58,677.37 by a preponderance of the evidence. [American's Exhibit No. 5].

305. American filed its proof of claim in April, 1992 for ground handling services rendered by AMR Services to Midway during the post-petition period. *Id.*

306. The Trustee argues that the ground handling services component of the Claims is not before the Court.

307. The proof of claim was filed by American because American was assigned the benefits of the service agreement be-

tween AMR Services Corporation and Midway in December, 1990, prior to Midway filing for Chapter 11 protection. *Id.*

308. Under Federal Rule of Bankruptcy Procedure 3001(e), American was the proper assignee of the Claims.

309. The transaction giving rise to the Claims such as security guard services at gates and ground handling services at airports were undertaken between American and Midway, with the latter acting in its capacity as debtor-in-possession.

310. The services provided by American that gave rise to the subject disputed Claims conferred a substantial and demonstrable benefit upon Midway's Estate.

311. These services permitted Midway to continue operating after March 25, 1991.

312. In the absence of such services provided by American, Midway would not have been able to maintain the viability of its attempted reorganization efforts.

### (iii) *UATP Charges*

313. American owes Midway $461,516.75, representing $487,615.57 in November, 1991 UATP charges, less unpaid amounts due American (as reflected in its Claims) of $26,098.82. This is a claim for the Chapter 11 phase of the case.

314. The Trustee does not object to the priority or amount of this component of American's Claims for unpaid amounts of UATP due American of $26,098.82. [9/16/97 Tr. at 22:9–16 (Thompson); American's Exhibit No. 4; Trustee's Exhibit No. 248].

### U. *American Is Entitled to Recover for Transactions Involving Commuter*

315. The Trustee's argument that the computation of American's Claims is overstated because it includes within it tickets issued by Commuter must be rejected.

316. As previously found, prior to and during the Chapter 11 phase, Midway permitted Commuter to use its ticket stock in selling tickets to passengers. [Underlying Material Background Facts for All Counts of the Complaint, ¶ 107]. This means that for

any ticket sold for travel on Commuter, Midway collected the funds from the passenger. *Id.*

317. As previously found, industry custom and practice confirms that the carrying airline bills the airline whose ticket stock was used because that airline held the funds from the sale of those tickets and had the liability on its books. *Id.* at ¶ 109.

318. Throughout the course of dealing between Midway and American, both prior to and during the Chapter 11 phase, Midway cleared all claims on the Commuter's behalf with American through the ACH. *Id.* at ¶ 110.

319. When American billed Commuter tickets to Midway, it did so in full accordance with industry custom and practice and the trade usage and course of dealing between the parties. [9/9/97 Tr. at 115:6–21 (Zeko) ].

## V. *The Court Cannot Presently Determine if There Is a Basis to Unwind the ACH December, 1991 Partial Recast*

320. The ACH communicated to American, Midway, the Trustee and other participating airlines that a December, 1991 recast was going to take place for the November, 1991 clearing month for Midway's account (the "Partial Recast"). [American's Exhibit No. 31; Trustee's Exhibit Nos. 81 and 82].

321. American submitted a claim to the ACH for $7,954,364.67 for transactions with Midway in the month of November, 1991 on December 19, 1991. [Trustee's Exhibit No. 32].

322. The ACH effected a Partial Recast settlement on December 30, 1991. [Trustee's Exhibit Nos. 83 and 84].

323. Based upon its submission, American received $547,890.28 in the Partial Recast. [American's Answer to Complaint, ¶ 102; Trustee's Exhibit Nos. 31, 83 and 84; 9/9/97 Tr. at 139:6–22 (Zeko); 9/10/97 Tr. at 80:3–81:14 (Zeko) ].

324. The ACH also recast UATP transactions for Midway's net creditors and debtors on January 15, 1992. [Trustee's Exhibit No. 82].

325. $754,984.54 of Midway funds were distributed to other airlines by the ACH as a result of the Partial Recast. [Trustee's Exhibit Nos. 83 and 84].

326. The bulk of the Trustee's claim against American stems from an attempt to unwind the Partial Recast. The Trustee contends that the $547,890.28 paid to American as partial payment for the sums owed American should never have been paid.

327. Based on the limited record, the Court cannot presently determine if there is a basis to unwind the Partial Recast.

## COUNT I

### CONCLUSIONS OF LAW

1. Section 503(b)(1) of the Bankruptcy Code provides that "there shall be allowed administrative expenses, . . . including . . . the actual, necessary costs and expenses of preserving the estate. . . ." 11 U.S.C. § 503(b)(1). In turn, Section 507(a)(1) of the Bankruptcy Code confers priority status upon "administrative expenses allowed under section 503(b). . . ." 11 U.S.C. § 507(a)(1). The "burden of proving entitlement to an administrative expense is on the claimant and the standard of proof is a preponderance of the evidence." *Dreamwerks Production Group, Inc. v. Party Masters, Inc. (In re Party Masters, Inc.)*, No. 91 B 22949, Adv. No. 92 A 00010, 1992 WL 106259, at *23 (Bankr.N.D.Ill. April 23, 1992).

2. American has the burden of proving each of the elements of its Claims by a preponderance of the evidence. *Woods v. City Nat'l Bank & Trust Co.*, 312 U.S. 262, 268, 61 S.Ct. 493, 85 L.Ed. 820 (1941); *BOSP Invs. v. Official Comm. of Unsecured Creditors (In re Sheridan)*, 187 B.R. 611, 613 (N.D.Ill.1995); *In re Dynacircuits, L.P.*, 143 B.R. 174, 176 (Bankr.N.D.Ill.1992); *In re Stoecker*, 128 B.R. 205, 208 (Bankr.N.D.Ill. 1991); *In re Englewood Community Hosp. Corp.*, 117 B.R. 352, 358 (Bankr.N.D.Ill.1990); *Home Savs. Ass'n of Kansas City, F.A. v. Woodstock Assocs. I, Inc. (In re Woodstock Assocs. I, Inc.)*, 120 B.R. 436, 451 (Bankr. N.D.Ill.1990); *In re Patch Graphics*, 58 B.R. 743, 745 (Bankr.W.D.Wis.1986).

3. This evidentiary burden never shifts from American, the party seeking allowance of an administrative claim. *In re Molnar Bros.*, 200 B.R. 555, 559 (Bankr.D.N.J.1996). ("Unlike the burden of going forward which may shift to the objecting party, the burden of persuasion always remains with the claimant."); *In re Bellman Farms, Inc.*, 140 B.R. 986, 995 (Bankr.D.S.D.1991) (same); *In re ICS Cybernetics, Inc.*, 111 B.R. 32, 36–37 (Bankr.N.D.N.Y.1989) (same).

4. To be afforded administrative status, American must prove that the expenses incurred were both actual and necessary. *Patch Graphics*, 58 B.R. at 745–746; *Mark IV Properties, Inc. v. Club Dev. & Management Corp. (In re Club Dev. & Management Corp.)*, 27 B.R. 610, 612 (9th Cir. BAP 1982); *In re Rhymes, Inc.*, 14 B.R. 807, 808 (Bankr. D.Conn.1981).

5. Expenditures must benefit the estate as a whole and not just the creditor claimant to qualify as actual and necessary expenses. *Fruehauf Corp. v. Jartran, Inc. (In re Jartran, Inc.)*, 886 F.2d 859, 871 (7th Cir.1989) (*"Jartran II"*); *Woodstock Assocs.*, 120 B.R. at 451; *Patch Graphics*, 58 B.R. at 746.

6. American also must prove that the expenses for which it seeks administrative priority arose out of a transaction with Midway or the Trustee. *In re Jartran, Inc.*, 732 F.2d 584, 586–587 (7th Cir.1984) (*"Jartran I"*); *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 954 (1st Cir.1976); *Employee Transfer Corp. v. Grigsby (In re White Motor Corp.)*, 831 F.2d 106, 110 (6th Cir.1987); *Dynacircuits*, 143 B.R. at 176.

7. A claim is not rendered a post-petition claim merely by the fact that the time for payment is triggered by an event that happens after the filing of the petition. *Chiasson v. J. Louis Matherne and Assocs. (In re Oxford Management, Inc.)*, 4 F.3d 1329, 1335 n. 7 (5th Cir.1993).

8. Administrative expense claims should be narrowly construed in order to keep administrative expenses at a minimum and thus preserve the estate for the benefit of all creditors. *United Trucking Serv., Inc. v. Trailer Rental Co., Inc. (In re United Trucking Serv., Inc.)*, 851 F.2d 159, 164 (6th Cir.1988); *In re Atlantic Container Corp.*, 133 B.R. 980, 992 (Bankr.N.D.Ill.1991); *Stoecker*, 128 B.R. at 208; *Englewood Community Hosp.*, 117 B.R. at 358.

9. An administrative claimant does not meet its burden of proof where the proof of claim is supported by estimates and where accurate documentation relating to the proof of claim is not before the court. *See Atlantic Container*, 133 B.R. at 992.

10. The Court is not obligated to attempt to reconstruct the record of proofs needed by an alleged administrative claimant to whose claim a trustee has objected. *See, e.g., In re Stoecker*, 143 B.R. 118, 130 (Bankr. N.D.Ill.), *aff'd in part, rev'd in part*, 143 B.R. 879 (N.D.Ill.1992), *aff'd in part, vacated in part*, 5 F.3d 1022 (7th Cir.1993).

11. Creditors are presumed to act primarily in their own best interests, and efforts undertaken by a creditor solely to further its own self-interest will not be compensable notwithstanding any incidental benefit to the estate. *Woodstock Assocs.*, 120 B.R. at 451 (quoting *Haskins v. United States (In re Lister)*, 846 F.2d 55, 57 (10th Cir.1988)); *see also In re United States Lines, Inc.*, 103 B.R. 427, 430 (Bankr. S.D.N.Y.1989), *aff'd*, No. 90 CIV. 3823, 1991 WL 67464 (S.D.N.Y. April 22, 1991); *Wolf Creek Collieries Co. v. GEX Ky., Inc.*, 127 B.R. 374, 379 (N.D.Ohio 1991); *In re D'Lites of Am., Inc.*, 108 B.R. 352, 356 (Bankr. N.D.Ga.1989); *In re Cuisinarts, Inc.*, 115 B.R. 744, 750 (Bankr.D.Conn.1990); *Patch Graphics*, 58 B.R. at 746; *Hassett v. Revlon, Inc. (In re O.P.M. Leasing Servs., Inc.)*, 23 B.R. 104, 121 (Bankr.S.D.N.Y.1982).

12. An incidental benefit standing alone is not a sufficient basis upon which to grant administrative priority. *Patch Graphics*, 58 B.R. at 746; *O.P.M. Leasing*, 23 B.R. at 121.

13. Unsecured creditors should not be forced to bear the burden of expenses incurred by a creditor acting in its own self-interest to further its own goals. *Wolf*

*Creek,* 127 B.R. at 379 (quoting *In re Hayes,* 20 B.R. 469, 473 (Bankr.W.D.Wis.1982)).

14. Claims under § 503(b)(1)(A) are judged by the actual value received by the estate and not the cost incurred by the creditor. *In re California Steel Co.,* 24 B.R. 185, 188 (Bankr.N.D.Ill.1982); *Patch Graphics,* 58 B.R. at 746; *Rhymes,* 14 B.R. at 808.

15. A claim arising under an executory contract assumed during a bankruptcy case constitutes an administrative expense entitled to priority under § 503(b)(1). *See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.),* 78 F.3d 18, 25–26 (2d Cir.1996) (unexpired leases of nonresidential real property); *Elliott v. Four Seasons Properties (In re Frontier Properties, Inc.),* 979 F.2d 1358, 1366–1367 (9th Cir.1992); *GATX Leasing Corp. v. Airlift Int'l, Inc. (In re Airlift Int'l, Inc.),* 761 F.2d 1503, 1509 n. 5 (11th Cir. 1985); *In re Norwegian Health Spa, Inc.,* 79 B.R. 507, 509 (Bankr.N.D.Ga.1987).

16. Contracts assumed post-petition provide a post-bankruptcy benefit to the debtor's estate. *See Klein Sleep,* 78 F.3d at 25.

17. The Seventh Circuit has recognized that conferring administrative expense status for claims arising under contracts assumed post-petition serves "the important purpose of encouraging creditors to participate in reorganization plans, for 'there would be little chance of attracting ... creditors to deal with a financially troubled debtor if the performance of the debtor's obligations to [such creditors] was not ... assured'". *Jartran II,* 886 F.2d at 869 (quoting *In re Chugiak Boat Works, Inc.,* 18 B.R. 292, 298 (Bankr.D.Alaska 1982)).

18. There is no dispute that Midway assumed the Bilateral Agreement on or after March 25, 1991. *See* Underlying Material Background Facts for All Counts of the Complaint, ¶ 21. Midway, as debtor-in-possession, continued to renew the Bilateral Agreement throughout the Chapter 11 proceeding on a monthly basis and in fact renewed the Bilateral Agreement through at least November 30, 1991. [*Id.* at ¶ 25; American's Exhibit Nos. 125 and 126].

19. Thus, the Bilateral Agreement was in place at the time Midway ceased operations on November 13, 1991. [*Id.* at ¶ 27].

20. Jonathan Peters testified without refutation that all tickets issued by Midway on or before Midway's shutdown on November 13, 1991, were governed by the Bilateral Agreement and therefore American's transportation of Midway-ticketed passengers throughout the period of American's Claims were done pursuant to the Bilateral Agreement. [9/8/97 Tr. at 80:8–81:3 (Peters)]. There is no contrary evidence in the record.

21. Midway assumed the Bilateral Agreement post-petition under 11 U.S.C. § 365 in order to continue to operate its business in the ordinary course, which required Midway to satisfy all of its obligations under the Bilateral Agreement. *See Airlift Int'l,* 761 F.2d at 1509. *See also In re Wabash Valley Power Ass'n, Inc.,* 72 F.3d 1305, 1310 (7th Cir.1995) (a contract must be assumed under § 365 in its entirety, including all of it burdensome as well as its beneficial provisions), *cert. denied,* —— U.S. ——, 117 S.Ct. 389, 136 L.Ed.2d 305 (1996); *In re Chicago, Rock Island & Pacific Ry. Co.,* 860 F.2d 267, 272 (7th Cir.1988) (same).

22. Midway, its Estate and its passengers reaped substantial benefits from the provision of services by American under the Bilateral Agreement. Because American provided such services post-petition under the Bilateral Agreement and because Midway assumed the Bilateral Agreement post-petition, American's post-petition Claims are entitled to the benefit afforded under §§ 507(a)(1) and 503(b).

23. A Chapter 7 trustee is bound by the prior acts of a debtor-in-possession, including the debtor-in-possession's assumption of a contract. Any other result would be unfair to creditors (i.e. the other contracting parties) who rely on the debtor-in-possession performing its obligations under a contract. *See Steege v. Accountants Prof'l Staff Inc. (In re Superior Toy & Mfg. Co. Inc.),* No. 94 C 3181, 1995 WL 276024, at * 8–9 (N.D.Ill. 1995), *aff'd* 78 F.3d 1169 (7th Cir.1996).

24. "Creditors must be able to deal freely with debtors-in-possession, within the con-

fines of the bankruptcy laws, without fear of retribution or reversal at the hands of a later appointed trustee." *Armstrong v. Norwest Bank, Minneapolis, N.A.,* 964 F.2d 797, 801 (8th Cir.1992).

25. Under § 365(g)(2), the rejection of a previously assumed contract gives rise to a post-petition claim for such breach. *See, e.g., Norwegian,* 79 B.R. at 509.

26. Midway breached the Bilateral Agreement by its refusal or inability to compensate American for the services provided under the Bilateral Agreement. American's damages arising from this breach are reflected in American's passenger transportation component of its Claims.

27. The expenses incurred by American subsequent to November 13, 1991 were actual and necessary costs of preserving Midway's Estate in accordance with § 503.

28. The expenses incurred by American arose out of a transaction with either Midway or the Trustee, as they were incurred in accordance with the Bilateral Agreement.

29. Because the expenses enumerated in American's Claims arose out of a transaction with the Trustee or Midway, they qualify as administrative expenses. *See Jartran,* 732 F.2d at 586.

A. *The Passenger Transportation Services Provided by American to Midway Under the Bilateral Agreement Were Actual and Necessary Costs of Preserving Midway's Estate*

30. The passenger transportation component of the Claims is entitled to priority under § 503(b)(1) because American benefitted Midway's Estate. The Seventh Circuit has established a two-prong test for determining whether a claim is entitled to administrative status in these circumstances. First, the transaction giving rise to the claim must have arisen as a result of a transaction between the creditor and the debtor's estate. Second, the transaction must have conferred upon the debtor's estate a benefit in the operation of its post-petition business. *Jartran I,* 732 F.2d at 587.

31. The passenger transportation component of the Claims asserted by American against Midway is entitled to administrative priority status under all of these criteria. First, it is uncontroverted that the transactions giving rise to the passenger transportation component were undertaken between American and Midway, with the latter acting in its capacity as debtor-in-possession. Next, there is no question that the services provided by American that gave rise to this component conferred a substantial and demonstrable benefit upon Midway's Estate. Midway represented to this Court (in the course of its efforts to compel American with respect to the Bilateral Agreement and other airlines to continue to perform under the interline agreements and obtain authority to assume its agreements with the ACH) that Midway's prospects for a successful reorganization were dependent upon the reciprocal passenger services of the other members of the airline industry. [American's Exhibit No. 45 (Affidavit of former President of Midway, Thomas E. Schick, in support of Motion for a Temporary Restraining Order, ¶ 19) ].

32. Midway's representations to the Court regarding the interline agreements and ACH agreements demonstrate that the services provided under such agreements, and in particular those services provided by American that gave rise to the Claims, were beneficial to the Midway Estate. The type of services provided to Midway passengers by American post-petition (*e.g.,* transporting Midway passengers in the event a Midway flight was canceled or service was otherwise interrupted) did not differ from the services provided by American pre-petition. Midway acknowledged that such services were essential when it petitioned this Court to issue a Temporary Restraining Order and to authorize Midway to assume its agreements with the ACH.

33. The services provided by American fulfilled Midway's obligations to its passengers and relieved Midway of the need to perform them. American provided services according to established procedures in the airline industry and requested payment in a manner consistent with the Bilateral Agreement, past practices and the requirements of the Bankruptcy Code.

34. American has shown, by a preponderance of the evidence, that the passenger transportation services giving rise to this component of the Claims were actual and necessary costs of preserving Midway's Estate and were beneficial thereto.

35. The Trustee maintains that this component of American's Claims is untrustworthy based on a number of allegedly improperly billed flight coupons out of a total of 150,000 coupons. The Trustee argues that these examples of improperly billed flight coupons represent a systemic problem in American's pricing system.

36. The Court found that although the problem exists, its extent is uncertain and the precise amount of overcharge has not been quantified either through a full audit of the Claims and underlying flight coupons and invoices, or through a valid statistical sampling.

37. Neither party has conducted a specific survey and sampling of the flight coupons and related documentation underlying American's passenger transportation component of the Claims that would be admissible if conducted according to the principles accepted by social scientists and statisticians for gathering and analyzing survey data. *See, e.g., Baumholser v. Amax Coal Co.,* 630 F.2d 550, 552 (7th Cir.1980); E. Cleary, *McCormick on Evidence* § 208 at 642–643 n. 11 (3d ed.1984) (collecting cases).

38. The services provided by American to Midway passengers facilitated, in great part, the payment to the Midway Estate of approximately $15.2 million from American Express, First Bank and Diner's Club, which further demonstrates the benefits conferred upon Midway's Estate by such services. The credit card companies/processors, as a condition to continuing their relationship with Midway following the filing of its Chapter 11 petition, required Midway to deposit with them substantial funds. The purpose of the deposits was to secure any future claims that the credit card companies/processors may have had in the event that a Midway passenger contested its obligation to reimburse its credit card issuer for a ticket that was not honored by Midway. Because American transported these Midway-ticketed passengers after Midway's shutdown, those passengers did not seek to cancel their obligations to their credit card companies/processors for the price of the ticket. In turn, Midway's exposure to the risk of passenger claims for refunds was eliminated and the credit card companies/processors paid the money they were holding—millions of dollars to the Midway Estate. [Midway's Answer to Request to Admit No. 25; 9/15/97 Tr. at 26:4–27:2 (Brosseau); 9/18/97 Tr. at 11:23–12:11 (Thompson)].

39. Moreover, Midway has already received the funds—either from credit card companies/processors or in cash from Midway passengers—for the Midway passengers' tickets which were purchased, but never used for travel on Midway. Instead, American provided services to those passengers. American's transportation of such Midway passengers conferred a substantial benefit upon the Midway Estate.

40. The Trustee does not dispute that such payments took place or that they occurred as the direct result of American (and other airlines) transporting the Midway-ticketed passengers post-shutdown. [Midway's Answer to Request to Admit No. 25; 9/15/97 Tr. at 26:4–27:2 (Brosseau); 9/18/97 Tr. at 11:23–12:11 (Thompson)].

41. The Trustee does dispute, however, the total amount of payments made to the Midway Estate.

42. Ms. Thompson testified that the payments were closer to $6 million. The Court concludes that Ms. Thompson's testimony failed to rebut Mr. Brosseau's testimony.

43. Ms. Thompson lacked expertise in the area, failed to proffer into evidence the documentary basis for her computation and was shown to have a mistaken recollection of Midway's payment history. *See* Underlying Material Background Facts for All Counts of the Complaint, ¶ 240.

44. But for the services provided by American (and other similarly situated carriers), Midway's Estate would not have received approximately $15.2 million from the credit card companies/processors for distribution to Midway's creditors. The benefits

provided by American to Midway's Estate were thus available to Midway's creditors as a whole.

45. The passenger transportation services component of the Claims is an administrative expense pursuant to § 503(b)(1)(A) and therefore is entitled to priority status pursuant to § 507(a)(1).

46. The Court concludes that this component of American's Claims is entitled to administrative priority, but the Court is unable to determine the precise amount.

47. American has not proven by a preponderance of the credible evidence a liquidated sum.

48. American has the burden to prove the amount of its Claims.

49. Based on the evidence, the Court concludes that American has not met this burden.

50. Thus, allowance of American's passenger transportation component of the Claims must be denied as to the amount.

51. The passenger transportation component is overstated in several respects: it contains requests for coupons billed twice; requests for services American rendered to other airlines; free tickets; void coupons; and tickets for which the Midway Estate would not be liable, albeit in an unliquidated sum not properly calculated or quantified to date.

52. American argues that it supported this component of its Claims in full accordance with the terms of the Bilateral Agreement, the ACH manual of procedure, and the course of dealing between the parties by placing into evidence every flight coupon lifted or exchanged by American's personnel from former Midway passengers as well as the detailed ticket listings and the summary invoices submitted to Midway in the normal course of business.

53. The ACH procedures do not govern the bankruptcy claims allowance process and the controlling rules changed to the Federal Rules of Bankruptcy Procedure when the claim reconciliation process between American and Midway shifted from the ACH procedures to the arena of bankruptcy claim allowance.

54. The burden was on American to sort through the documents which support its Claims, not the Trustee. Unlike the ACH procedures, the Trustee was not obligated to scrutinize the items submitted by American. Rather, the burden falls upon American to demonstrate the accuracy of all the amounts claimed under its Claims. What may have sufficed outside of bankruptcy does not meet the standards which a claimant must satisfy in this Court.

55. Admittedly, American has not performed this task. Consequently, the Court is unable to determine the amount of this component of American's Claims.

**B. *Under 11 U.S.C. § 726(b), American's Passenger Transportation Services Benefitted Both the Chapter 11 and Chapter 7 Estates***

56. 11 U.S.C. § 726(b) provides that a Chapter 7 claim has priority over a Chapter 11 claim:

> Payment on claims of a kind specified in paragraph (1), (2), (3), (4), (5), (6), (7), or (8) of section 507(a) of this title, or in paragraph (2), (3), (4), or (5) of subsection (a) of this section, shall be made pro rata among claims of the kind specified in each such particular paragraph, except that in a case that has been converted to this chapter under sections 1009, 1112, 1208, or 1307 of this title, a claim allowed under section 503(b) of this title incurred under this chapter after such conversion has priority over a claim allowed under section 503(b) of this title incurred under any other chapter of this title or under this chapter before such conversion and over any expenses of a custodian superseded under section 543 of this title.

11 U.S.C. § 726(b).

57. All components of American's Claims for the period November 1, 1991 through April 30, 1992 are entitled to administrative priority as to both the Chapter 11 and the Chapter 7 phases of the case, but an undetermined portion thereof relating to the Chapter 7 phase of the administration of the bankrupt estate has priority over the undetermined portion relating to the Chapter 11 phase of

the case which is effectively subordinated by § 726(b).

58. American transported the Midway-ticketed passengers after November 13, 1991, pursuant to the Bilateral Agreement. *See* Underlying Material Background Facts for All Counts of the Complaint, ¶ 33. The tickets of approximately 150,000 Midway-ticketed passengers were either lifted or exchanged by American's personnel after Midway ceased operations.

 59. Under recognized bankruptcy principles, a debt arises when all transactions necessary for liability occur, regardless of whether the debt was contingent, unliquidated or unmatured when the petition was filed. *See United States v. Gerth*, 991 F.2d 1428, 1433 (8th Cir.1993); *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1036 (5th Cir.1987); *Energy Coop., Inc. v. Gulf Oil Corp. (In re Energy Coop., Inc.)*, 80 B.R. 921, 923 (Bankr.N.D.Ill.1987).

 60. Applying these bankruptcy principles to the instant facts, Midway's obligation to fly the Midway-ticketed passengers was transferred from Midway to American at the time of the lift or exchange. Accordingly, Midway became obligated to pay American (and a debt arose between them) at the time of each lift and exchange. That is also the time in which American provided the benefit to the Midway Estate. As a result, those lift and exchange transactions occurring between November 1 and November 26, 1991, benefitted the Chapter 11 Estate and are entitled to Chapter 11 priority. Those lift and exchange transactions occurring after conversion of the case between November 27, 1991 and April 30, 1992, benefitted the Chapter 7 Estate and are entitled to Chapter 7 priority.

61. The appropriate quantifications thereof, however, in light of § 726(b) have not been proven by American on the record before the Court thus far.

## C. The Non–Transportation Services and Ground Handling Services Provided by American to Midway Were Actual and Necessary Costs of Preserving Midway's Estate

 62. The post-petition non-transportation services provided by American and the ground handling services provided by AMR Services Corporation (with a valid assignment to American) in the amount of $337,-910.97 (after reducing the claim by Midway's November billings of $36,259.00) and $58,-677.37 respectively, are entitled to priority status under § 503(b)(1) because American benefitted Midway's Estate.

63. The non-transportation services and the ground handling services components of the Claims asserted by American against Midway are entitled to administrative priority status under the Seventh Circuit criteria embodied in *Jartran I* and *Jartran II*. It is uncontroverted that the non-transportation services, including the security service for gates at LaGuardia Airport and baggage handling services giving rise to these components, were undertaken between American and Midway, with the latter acting in its capacity as debtor-in-possession.

64. The services provided by American that gave rise to the Claims conferred a substantial and demonstrable benefit upon Midway's Estate. The services provided permitted Midway to continue operating after March 25, 1991 and Midway's prospects for a successful reorganization were dependent upon American providing those necessary services. In the absence of such services provided by American, Midway would not have been able to maintain the viability of its reorganization efforts.

65. As to the Trustee's argument that the ground handling services component is not before this Court, the proof of claim was filed by American based on a valid assignment made in December, 1990—prior to Midway's Chapter 11 filing. Under Federal Rule of Bankruptcy Procedure 3001(e), American was the proper assignee of the Claim.

66. The non-transportation services and the ground handling services Claims are administrative expenses pursuant to § 503(b)(1)(A) and therefore are entitled to priority status pursuant to § 507(a)(1).

## D. The UATP Chargeback Constituted Actual and Necessary Costs of Preserving Midway's Estate

 67. The UATP chargeback component of the Claims of $26,098.82 is entitled to

priority under § 503(b)(1) because American benefitted Midway's Estate.

68. American permitted Midway passengers to charge their airline tickets on an American issued UATP card, and as a result, Midway received compensation for those purchased tickets during the Chapter 11 proceeding. American's UATP chargeback Claim consists of credits due and owing American related to payments previously made by American to Midway in the November claim month pursuant to customer chargebacks during the post-petition period. There is no dispute that the UATP chargeback component is entitled to administrative priority status under the criteria embodied in *Jartran I* and *Jartran II.*

69. The UATP chargeback Claim of $26,-098.82 is an administrative expense pursuant to § 503(b)(1)(A) and therefore is entitled to priority status pursuant to § 507(a)(1).

**E.** *The Trustee's Action is Timely*

70. There is no time bar on objecting to a proof of claim. *In re Hutchins,* 162 B.R. 1014, 1022 (Bankr.N.D.Ill.1994); *In re Ross,* 162 B.R. 785, 788 (Bankr.N.D.Ill.1993).

71. Thus, American's argument that the Trustee's objections to the Claims are barred lacks merit.

### COUNT II

#### WHETHER THE TRUSTEE IS ENTITLED TO A SETOFF

1. Pursuant to this Count, the Trustee seeks a setoff of the amount allowed or granted administrative priority to American against the amount allegedly due and owing Midway. The Trustee contends that American owes Midway approximately $731,092.00 for UATP receivables and services provided to American under the Bilateral Agreement. The Trustee maintains that to the extent American's Claims are allowed and granted administrative priority, the amount of the Claims should be offset by $731,092.00, plus any additional credits due and owing Midway pursuant to 11 U.S.C. § 550. The Trustee does not cite to the applicable section of the Bankruptcy Code which governs setoff.

2. Section 553(a) of the Bankruptcy Code governs the exercise of setoffs between debtors and creditors and provides in relevant part:

> Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case....

11 U.S.C. § 553(a).

3. In general, the right of setoff allows parties who owe mutual debts to each other to assert the amounts owed on these debts, subtract one from the other, and then pay only the balance. *Mottaz v. St. Louis Post–Dispatch Pulitzer Publ'g Co. (In re Murphy),* 203 B.R. 972, 975 (Bankr.S.D.Ill. 1997) (citation omitted).

4. The right of setoff is within the discretion of the Court, exercised under the principles of equity. *United States v. Maxwell (In re Pyramid Indus., Inc.),* 210 B.R. 445, 449 (N.D.Ill.1997).

5. The Seventh Circuit, in speaking to § 553, opined that "[t]he only sense we can make of the rule is that it recognizes that the creditor who owes his debtor money is like a secured creditor; indeed, the mutual debts, to the extent equal, secure each party against the other's default." *In re Elcona Homes Corp.,* 863 F.2d 483, 485 (7th Cir.1988).

6. As the Supreme Court recently observed, setoff avoids the "absurdity of making A pay B when B owes A." *Citizens Bank of Maryland v. Strumpf,* 516 U.S. 16, 18, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995) (citation omitted).

7. Section 553(a) recognizes and preserves rights of setoff where four conditions exist: (1) the creditor holds a "claim" against the debtor that arose before the commencement of the case; (2) the creditor owes a "debt" to the debtor that also arose before the commencement of the case; (3) the claim and debt are "mutual"; and (4) the claim and debt are each valid and enforceable. *See St.*

*Francis Physician Network, Inc. v. Rush Prudential HMO, Inc. (In re St. Francis Physician Network, Inc.)*, 213 B.R. 710, 715 (Bankr.N.D.Ill.1997) (citation omitted).

### A. *Whether Count II [7] of the Complaint is Barred by the Statute of Limitations Under 11 U.S.C. § 546(a)*

 8. American contends that to the extent the Trustee in Count II of the Complaint seeks to avoid the Partial Recast settlement payment made by the ACH on December 31, 1991, such action is barred by the statute of limitations set forth in 11 U.S.C. § 546(a).

9. Section 546(a) provides in relevant part:

(a) An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of—

(1) the later of—

(A) 2 years after the entry of the order for relief; or

(B) 1 year after the appointment or election of the first trustee under section 702, 1104, ... of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or

(2) the time the case is closed or dismissed.

11 U.S.C. § 546(a).

10. An order for relief was entered on March 25, 1991. *See* Underlying Material Background Facts for All Counts of the Complaint, ¶ 1. Hence, two years after the order for relief was March 25, 1993.

11. The Trustee was appointed on November 27, 1991. *Id.* at ¶ 5. One year after the appointment of the Trustee was November 27, 1992. The Trustee filed the instant Complaint in July, 1996.

12. American contends that Count II of the Complaint is not timely because it should have been commenced by or before March 25, 1993.

13. From the face of the Complaint, Count II does not appear to be an action or proceeding under 11 U.S.C. §§ 544, 545, 547,

548, or 553. Rather, the Trustee seeks an offset under § 550.

14. Section 550, however, is not the section by which the Trustee can offset the amount American allegedly owes Midway.

15. The Bankruptcy Code contains several provisions which describe a trustee's avoiding powers. *See* 11 U.S.C. §§ 544(a) and (b); 545; 547(b); 548(a) and (b); 549(a); 553(b).

16. Section 550 "prescribes the liability of a transferee of an avoided transfer," and "enunciates the separation between the concepts of avoiding a transfer and recovering from the transferee." H.R.Rep. No. 595, 95th Cong., 1st Sess. 375, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6331; S.Rep. No. 989, 95th Cong., 2d Sess. 90, *reprinted in* 1978 U.S.Code Cong. & Admin.News, 5787, 5876. "Congress deliberately distinguished between avoiding a transfer and recovering from the transferee. They are conceptually different, and each of them is remedially significant. Recovery depends upon avoidance but does not exclusively define it. Rather, recovery is a remedy that supplements the remedial effect of avoidance per se." 2 D. Epstein, S. Nickles and J. White, *Bankruptcy* § 6–87 at 222 (1992) (footnote omitted).

17. The Bankruptcy Code provides separate statutes of limitations for avoidance and recovery. *See* 11 U.S.C. § 546(a) (avoidance) and § 550(e) (recovery).

 18. "Thus, § 550(a) is a secondary cause of action after a properly appointed representative has prevailed pursuant to the avoidance sections of the Code. Section 550(a) stands as a recovery statute only and not as a primary avoidance basis for an action, as it will only survive when coupled with the transfer avoidance sections of the Code." *Santee v. Northwest Nat. Bank (In re Mako, Inc.)*, 127 B.R. 471, 473 (Bankr.E.D.Okla. 1991) (citation omitted).

19. The right of setoff in bankruptcy cases is governed by § 553 which, pursuant to § 546(a), has a statute of limitations.

---

**7.** American incorrectly references Count III, which is a breach of contract claim.

20. Section 550 allows the Trustee to recover the avoided transfer; it is not the section under which the Trustee can avoid the transfer. *See generally Kepler v. Security Pacific Housing Servs. (In re McLaughlin)*, 183 B.R. 171, 176 (Bankr.W.D.Wis.1995) ("When a preferential transfer is avoided, the plain language of § 550(a) allows the trustee to recover the property transferred or its value.").

21. Accordingly, the Trustee should have commenced any action for setoff under § 553(b) by or before March 25, 1993. Because this action was commenced in July, 1996, Count II of the Complaint is barred by the statute of limitations set forth in § 546(a).

22. Because the Court finds that Count II is barred by § 546(a), the Court will not further discuss the merits of this Count.

## COUNT III

### WHETHER THE TRUSTEE HAS DEMONSTRATED THAT AMERICAN BREACHED THE BILATERAL AGREEMENT

1. Pursuant to this Count, the Trustee asserts a breach of contract claim against American for an alleged breach of the Bilateral Agreement. The Trustee alleges that during the period of Midway's operations as debtor-in-possession, American submitted invoices to the ACH for services purportedly rendered on behalf of Midway. Upon reconciliation of the invoices submitted by American for the period prior to the cessation of Midway's flight operations, the Trustee purportedly discovered that certain of the invoices submitted were inaccurate or otherwise improper, and reflected inflated prices for certain services. The Trustee contends that American submitted approximately $155,245.00 in overpriced invoices for the period of April 1, 1991 through November 13, 1991. The Trustee argues that these invoices were submitted in contravention of the Bilateral Agreement.

2. The Trustee contends that American received $547,890.00 as a result of the Partial Recast. Further, the Trustee maintains that of this amount, at least $64,245.00 should have been credited or paid to Midway due to American's overpricing and other improper billing procedures. In addition, as a result of its submission prior to November 14, 1991 of inaccurate and improper invoices to the ACH for payment from Midway, American was permitted to offset approximately $155,245.00 due and owing Midway. Finally, the Trustee argues that American's submission of inaccurate and overpriced invoices also allowed it to receive payment in full for certain expenses.

3. The Trustee requests that the Court find that American breached the Bilateral Agreement by submitting inaccurate and improper invoices to the ACH for payment from Midway and award Midway approximately $835,000.00 in damages.

4. The ACH effected the Partial Recast of Midway interline accounts on or about December 31, 1991. That Partial Recast involved the ACH impounding balances due to Midway for prior months and distributing the funds to other airlines on a pro rata basis as partial compensation for services rendered in November, 1991 or earlier.

5. The Partial Recast affected Midway accounts for passenger transportation interline, non-transportation and freight services.

6. There is no dispute that in the airline industry with respect to non-sampling airlines such as Midway and American, the carrying airline party to an interline agreement would price the tickets that were lifted and exchanged from the ticketing airline "in good faith" and to the best of its ability. [9/11/97 Tr. at 26:13–27:10 (Zeko) ].

7. In the event those priced tickets were believed by the ticketing airline to be improperly priced or otherwise improperly billed, the ACH Manual of Procedure provided for a six-month period to reject improper billings.

8. The undisputed evidence is that American did not intentionally submit improperly billed coupons to Midway or to the ACH. [9/9/97 Tr. at 130:13–23 (Zeko) ].

9. Rejected billing does not constitute a breach of contract.

10. In order to establish a breach of contract, Midway must prove by a preponder-

456

ance of the evidence that: (1) Midway and American entered into a valid and enforceable contract; (2) Midway performed its obligations under the contract; (3) American breached its obligations under the contract; and (4) Midway suffered damages as a proximate result of the breach. *Herzog v. Leighton Holdings, Ltd. (In re Kids Creek Partners, L.P.)*, 212 B.R. 898, 933 (Bankr.N.D.Ill. 1997) (citation omitted); *see also Servpro Indus., Inc. v. Schmidt*, 905 F.Supp. 475, 479 (N.D.Ill.1995).

11. It is undisputed that Midway and American entered into a valid and enforceable contract—the Bilateral Agreement.

12. However, the Trustee has failed to demonstrate the remaining requisite elements.

13. The Trustee failed to cite which specific portion or portions of the Bilateral Agreement American allegedly breached.

14. Further, the Trustee failed to cite any supporting case citation or authority. His failure to do so results in the forfeiture of the point. *See LINC Finance Corp. v. Onwuteaka*, 129 F.3d 917, 921 (7th Cir.1997); *Pelfresne v. Village of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir.1990).

15. The Court does not have a duty to research and construct legal arguments available to a party. *Head Start Family Educ. Program, Inc. v. Cooperative Educ. Serv. Agency 11*, 46 F.3d 629, 635 (7th Cir.1995).

16. Thus, the Court concludes that the Trustee failed to support his claim by a preponderance of the evidence that American breached the Bilateral Agreement by submitting improperly billed invoices for the period September–October, 1991.

## COUNT IV

### WHETHER THE COURT SHOULD ORDER AN ACCOUNTING OF THE INVOICES, RECEIPTS, DISBURSEMENTS, SERVICES AND OPERATIONS UPON WHICH AMERICAN'S CLAIMS ARE PREMISED

1. Pursuant to this Count, the Trustee seeks an accounting of the invoices, receipts, disbursements, services and operations upon which American's Claims are premised.

2. Whether a plaintiff has a right to an accounting depends on applicable state law, which neither party has cited. *See Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) (property interests are created and defined by state law).

3. Typically, as in Illinois, a right to an accounting arises when the defendant possesses money or property which, because of some particular relationship between himself and the plaintiff, he is obligated to surrender. 1A C.J.S. *Accounting* § 15 at 13 (1985).

4. An accounting is an equitable remedy, and courts have broad discretion to refuse to award such a remedy to a party who has an adequate remedy at law. *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir. 1985).

5. The Supreme Court in *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962) set forth the standards for allowing an equitable accounting:

The necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is, as we pointed out in *Beacon Theaters [v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959)]*, the absence of an adequate remedy at law. Consequently, in order to maintain such a suit on a cause of action cognizable at law, ... the plaintiff must be able to show that the "accounts between the parties" are of such a "complicated nature" that only a court of equity can satisfactorily unravel them.

*Id.* at 478, 82 S.Ct. 894 (footnotes omitted).

6. The Trustee must be able to show that accounts between the parties are so complicated that only a court of equity can satisfactorily unravel them. *Oil Exp. Nat., Inc. v. Burgstone*, 958 F.Supp. 366, 371 (N.D.Ill.1997).

7. Pursuant to Illinois law, a court will take jurisdiction of an accounting action in the absence of an adequate remedy at law and if the accounting action is based upon

one of the following: (1) a breach of a fiduciary relationship between the parties; (2) a need for discovery; (3) fraud; or (4) the existence of mutual accounts which are of a complex nature. *See, e.g., People ex rel. Hartigan v. Candy Club,* 149 Ill.App.3d 498, 500–501, 103 Ill.Dec. 167, 169, 501 N.E.2d 188, 190 (1st Dist.1986); *Metro–Goldwyn–Mayer, Inc. v. Antioch Theatre Co., Inc.,* 52 Ill.App.3d 122, 132, 9 Ill.Dec. 813, 367 N.E.2d 247, 255 (1st Dist.1977) (complexity of discovery and complicated and numerous accounting problems established equitable need for accounting).

▇▇▇ 8. The Court hereby exercises its discretion and declines to grant the Trustee the relief requested.

9. The Trustee has not alleged nor demonstrated that he lacks an adequate remedy at law.

10. The parties, however, do not dispute that this matter is extremely complex and difficult in nature.

11. Nevertheless, the Trustee's position seeking a formal accounting was not developed in his post-trial submissions nor supported by appropriate references to the trial record and pertinent legal authorities. Accordingly, the Court denies this unsupported Count. *See LINC Finance,* 129 F.3d at 921; *Pelfresne,* 917 F.2d at 1023.

12. The Court has no duty to research and construct legal arguments available to a party. *Head Start Family,* 46 F.3d at 635.

13. Although the Court denies the request for an accounting, the Court ordered in Count I of the Complaint that the parties completely and fully review the underlying documentation supporting the Claims to determine, if they can, the precise and proper amount for the passenger transportation services. If there remains a dispute regarding a specific item or items, then the Court will employ the assistance of an expert to help aid in its determination of the properly allowable amount under Federal Rule of Evidence 706(a). Thus, the Trustee's request is being functionally granted although not under the formal remedy of an accounting.

## COUNT V

### WHETHER THE TRUSTEE IS ENTITLED TO TURNOVER OF PROPERTY OF THE ESTATE UNDER 11 U.S.C. § 542

1. Pursuant to this Count, the Trustee contends that American submitted approximately $155,245.00 in improper invoices to the ACH for payment for the period April 1, 1991 through the cessation of Midway flight operations, $64,245.00 of which were submitted for the first thirteen days of November, 1991. Further, after Midway's cessations of operations, American submitted additional invoices for services relating to the transportation of Midway passengers. Such invoices included services rendered both prior and subsequent to Midway's cessation of operations. The ACH excluded Midway's accounts in the routine December monthly settlement because Midway's ACH account was insufficiently funded. Purportedly, Midway's ACH account contained $754,984.54 at the time that the December ACH reconciliation occurred.

2. The Trustee further alleges that American received $547,890.28 as a result of the Partial Recast settlement effected by the ACH on December 31, 1991. The Trustee contends that the Partial Recast allowed American to receive payment for services rendered after Midway ceased its flight operations and for other services for which American is not entitled to receive administrative priority. The Trustee maintains that the Partial Recast enabled American to receive $547,890.28 in Midway funds in December, 1991 when American actually owed money to Midway. The Trustee alleges that to the extent that American received payment for services for which it is not entitled to receive administrative priority, American has received a windfall at the expense of Midway's other creditors.

3. After giving effect to the recoveries to which Midway is entitled and the credits to which American is entitled, American purportedly owes Midway the sum of $835,-000.00. Thus, the Trustee requests that the Court enter an order pursuant to 11 U.S.C. § 542 requiring American to turnover the sum of $835,000.00 to the Trustee, reflecting

the amount due and owing Midway after giving effect to the recoveries to which Midway is entitled and the credits to which American is entitled.

4. The Bankruptcy Code statutory provision for turnover contained in 11 U.S.C. § 542(a) deals with property of the estate to be turned over, usually to the case trustee. Turnover is not intended as a remedy to determine disputed rights of parties to property. Rather, it is intended as the remedy to obtain what is acknowledged to be property of the bankruptcy estate. *Marlow v. Oakland Gin Co., Inc. (In re Julien Co.)*, 128 B.R. 987, 993 (Bankr.W.D.Tenn.1991).

5. Relief under § 542(a) is most frequently afforded to trustees against creditors who are in actual or constructive possession of the subject collateral at the time the bankruptcy petition is filed and who do not voluntarily surrender it. *See Pileckas v. Marcucio*, 156 B.R. 721, 725 (N.D.N.Y.1993).

6. Thus, the burden is usually on the trustee seeking turnover, *Groupe v. Hill (In re Hill)*, 156 B.R. 998, 1006 (Bankr. N.D.Ill.1993), and the evidence must show that the asset in question is part of the bankruptcy estate. *Mather v. Tailored Fabrics, Inc. (In re Himes)*, 179 B.R. 279, 282 (Bankr.E.D.Okla.1995).

7. Only property in which the debtor has an interest becomes part of the bankruptcy estate and can be made the subject of an order for turnover under § 542(a). *Cates–Harman v. Stage (In re Stage)*, 85 B.R. 880, 881 (Bankr.M.D.Fla.1988).

8. It follows that if the debtor does not have the right to possess or use property at the commencement of a case, a turnover action cannot be a tool to acquire such rights. *Creative Data Forms, Inc. v. Pennsylvania Minority Bus. Dev. Auth. (In re Creative Data Forms, Inc.)*, 41 B.R. 334, 336 (Bankr. E.D.Pa.1984), *aff'd*, 72 B.R. 619 (E.D.Pa. 1985), *aff'd*, 800 F.2d 1132 (3d Cir.1986).

9. The Court holds that at this point it is unable to determine whether the Trustee is entitled to turnover of property of the Midway Estate. Without a definitive amount of American's Claims, the Court can-

not determine whether Midway is entitled to recoveries from American. Further, the Court is unable to determine if American purportedly owes Midway the sum of $835,-000.00.

## A. *American's Laches Defense*

10. American contends that this Count of the Complaint should be barred under the doctrine of laches. American recognizes that the Bankruptcy Code does not contain a statute of limitations for turnover actions pursuant to § 542. Nevertheless, American argues that the Trustee waited over four years after the Partial Recast settlement payment to assert this action under § 542. American contends that the Trustee's delay is unreasonable and should be barred by the doctrine of laches.

11. The doctrine of laches arises due to a change in the conditions of the parties. *Lingenfelter v. Keystone Consol. Indus., Inc.*, 691 F.2d 339, 340 (7th Cir.1982). If a plaintiff unjustifiably delays in pursuing a cause of action and the defendant is prejudiced by the delay, the laches doctrine bars the plaintiff from proceeding. *See Hawxhurst v. Pettibone Corp.*, 40 F.3d 175, 181 (7th Cir.1994); *Herman v. City of Chicago*, 870 F.2d 400, 401 (7th Cir.1989); *Smith v. City of Chicago*, 769 F.2d 408, 410 (7th Cir. 1985); *Moriarty v. Glueckert Funeral Home, Ltd.*, 925 F.Supp. 1389, 1397 (N.D.Ill.1996).

12. Laches is an affirmative defense which is required to be proved by the party raising it. *Hawxhurst*, 40 F.3d at 181.

13. Whether to employ the doctrine rests within the sound discretion of the Court. *Baker Mfg. Co. v. Whitewater Mfg. Co.*, 430 F.2d 1008, 1011–1015 (7th Cir.1970), *cert. denied*, 401 U.S. 956, 91 S.Ct. 978, 28 L.Ed.2d 240 (1971).

14. The plaintiff bears the burden of explaining the reason for the delay in pursuing the action. *Zelazny v. Lyng*, 853 F.2d 540, 541 (7th Cir.1988).

15. Moreover, if "the delay is inexcusable, then the defendant must show prejudice."

*Lingenfelter*, 691 F.2d at 340. The *Zelazny* court further explained:

> [T]he plaintiff's inexcusable delay is relevant to whether actual prejudice has been shown. "If only a short period of time has elapsed since the accrual of the claim, the magnitude of prejudice require[d] before the suit should be barred is great, whereas if the delay is lengthy, prejudice is more likely to have occurred and less proof of prejudice will be required."

*Zelazny*, 853 F.2d at 543 (quoting *Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800, 807 (8th Cir.1979), *cert. denied*, 446 U.S. 913, 100 S.Ct. 1844, 64 L.Ed.2d 267 (1980)).

16. The mere passage of time cannot constitute laches. *Smith*, 769 F.2d at 410.

17. The Court concludes that the doctrine of laches does not bar the Trustee's § 542 turnover action.

18. American has failed to demonstrate how it was prejudiced by the delay in bringing the action. The record is devoid of any evidence of prejudice to American.

19. American received $547,890.28 from Midway in the ACH Partial Recast. American has had the use of those funds since December, 1991.

20. Moreover, American has failed to establish a lack of due diligence on the part of the Trustee.

21. American filed its first proof of claim in April, 1992.

22. In February, 1993, the Trustee requested documents to support the amounts American requested for passenger activity. That American destroyed documents pertinent to the instant matter does not constitute prejudice. American could have kept all relevant documents rather than destroy same. American would have this Court find that its own destruction of pertinent documents constitutes prejudice sufficient to impose the doctrine of laches against the Trustee.

23. If American suffered any prejudice, it was a result of its own actions, not those of the Trustee.

24. American cites *Greene v. Schmukler (In re De Berry)*, 59 B.R. 891 (Bankr. E.D.N.Y.1986) in support of barring this action. The court found in *De Berry* that a trustee who waited more than four years to commence a turnover action exceeded "any common sense definition of reasonableness." *Id.* at 898. The court dismissed the action because it found that the trustee ran afoul of the maxim "equity aids the vigilant, not those who slumber on their rights." *Id.* at 899 (citation omitted).

25. In *In re Diversified Prods., Inc.*, 100 F.3d 53 (7th Cir.1996), the Seventh Circuit discussed the *De Berry* case. In *Diversified*, the Chapter 7 trustee sought turnover of funds formerly held in a law firm's trust account. The bankruptcy court held that the law firm was obligated to turn over the value of the funds. *Id.* at 55. The district court affirmed that decision. *Id.* The Seventh Circuit held that the law firm was required to turn over the value of the property even though it no longer had the property in its possession because it had control over the funds when the firm deducted a portion of the monies to pay accrued attorneys' fees prior to remitting the funds to the debtor.

26. The court found that there are no equitable defenses to a trustee's demand for turnover of estate property other than the defenses enumerated in the statute. *Id.* at 56. Although factually distinct from the matter at bar, the Seventh Circuit noted in *Diversified* that § 542 supplanted equitable concepts utilized prior to the statute. The court noted that "there is no ground or reason for multiplying defenses.... All that is needed is a sensible interpretation of subsection (c)." *Id.* The court found statements in cases like *De Berry*, which suggest an equitable defense to a turnover action, "echoes of the pre-statutory regime." *Id.* The court in *Diversified* declined to imply any equitable defenses to a § 542 action. This Court will follow that directive.

27. Consequently, the Court declines to apply the doctrine of laches to bar the Trustee's § 542 turnover action and denies American's laches defense.

## AMERICAN'S AFFIRMATIVE DEFENSES

### A. Whether the Objections to the Claims are Barred by the Doctrines of Waiver and Estoppel

1. Next, American argues that the Trustee's objections to its Claims are barred by the doctrines of waiver and estoppel. American contends that its Claims against Midway are for services rendered from the period October, 1991 through February, 1992—a period in which Midway knew American was providing services to passengers holding Midway tickets. American argues that Midway did nothing to stop American from providing such services. In fact, according to American, Midway undertook to prevent American from ceasing provision of such services, seeking assumption of a number of contracts, as well as a temporary restraining order and preliminary injunction to require the continuation of services. American maintains that it fully expected to be reimbursed for its provision of such services to Midway's passengers. American contends that it was not until four years after the last Midway passenger flew on American, and four years after American filed its Claims, that the Trustee first objected to American's Claims. In addition, American asserts that its ticket sales records are routinely destroyed after two years and many of the documents that would further support its Claims are no longer available. For these reasons, American contends that the Trustee's objections to its Claims should be barred by the doctrines of waiver and estoppel.

### (i) Waiver

2. Waiver is the voluntary and intentional relinquishment of a known and existing right and may be either express or implied. See Caisse Nationale de Credit Agricole v. CBI Indus., Inc., 90 F.3d 1264, 1275 (7th Cir.1996); Havoco of America, Ltd. v. Sumitomo Corp. of America, 971 F.2d 1332, 1337 (7th Cir.1992). Waiver requires three elements: (1) existence of a right, privilege, advantage or benefit which may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage or benefit. A prerequisite ingredient of the waiver of a right or privilege consists of an intention to relinquish it. TMF Tool Co. v. Siebengartner, 899 F.2d 584, 590 (7th Cir.1990). "Before a party is deemed to have waived or relinquished a right or remedy available to it under the law, a clear and distinct manifestation of such an intent must be found." American Nat. Bank & Trust Co. v. K–Mart Corp., 717 F.2d 394, 398 (7th Cir.1983) (citation omitted).

### (ii) Estoppel

3. The Seventh Circuit has indicated that application of the doctrine of equitable estoppel is particularly appropriate in bankruptcy proceedings. Citation Cycle Co., Inc. v. Yorke, 693 F.2d 691, 695 (7th Cir. 1982). "The reasons for the general application of estoppel are simple enough—the doctrine prevents a party from benefitting from its own misrepresentations." Black v. TIC Invest. Corp., 900 F.2d 112, 115 (7th Cir. 1990).

4. Estoppel arises when one party has made a misleading representation to another and the other party has reasonably relied to his detriment on that representation. Id.

5. There are four requirements to establish a claim of estoppel against a party: (1) the party to be estopped must know the facts and must intend, or lead the other party to believe he intended, that his conduct will be acted upon; (2) the party seeking estoppel must be ignorant of the true facts; (3) the party asserting the estoppel must have actually and reasonably relied on the words or conduct; and (4) the reliance must have caused the party asserting the estoppel injury. McConahey v. United States (In re McConahey), 192 B.R. 187, 192 (Bankr. S.D.Ill.1996).

6. The Court declines to apply the doctrines of waiver or estoppel and bar the Trustee's objections to American's Claims. There is no evidence to support a conclusion that the Trustee or his agents knowingly waived the claims asserted against American

or made any misleading misrepresentations to American.

7. American has failed to allege or demonstrate any of the requisite elements of waiver—existence of a right, privilege, advantage or benefit which may be waived; the actual or constructive knowledge thereof; and the Trustee's intention to relinquish such right, privilege, advantage or benefit.

8. In addition, American has failed to allege or prove any of the requisite elements of estoppel—words or conduct by the Trustee that led American to take some action it would not otherwise have taken but for those words or actions; actual and reasonable reliance by American on the words or conduct; American did not know of or have access to facts contrary to those on which it relied; and the reliance caused American injury.

9. American's failure to cite authorities in support of a particular argument constitutes a waiver of the issue. *LINC Finance*, 129 F.3d at 921 (citing *Tyler v. Runyon*, 70 F.3d 458, 464 (7th Cir.1995); *Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 173 n. 1 (7th Cir.1996); and *Salazar v. City of Chicago*, 940 F.2d 233, 242–243 (7th Cir.1991)).

10. A litigant who fails to press a point by supporting it with pertinent authority forfeits the point. *Pelfresne*, 917 F.2d at 1023.

11. The Court has no duty to research and construct legal arguments available to a party. *Head Start Family*, 46 F.3d at 635.

12. Consequently, the Court declines to bar the Trustee's objections to American's Claims based on the doctrines of waiver and estoppel.

**B. Whether to Allow the Midway Estate to Retain the Benefit of the Services Without Compensation to American Would Be Inequitable and Unjust**

13. Next, American contends that to allow the Midway Estate to retain the benefit of the services it provided to Midway and its passengers without compensation to American would constitute an unjust and inequitable result.

14. The Seventh Circuit has made abundantly clear the limited scope of the equita-

ble powers of bankruptcy courts. *See In re Fesco Plastics Corp., Inc.*, 996 F.2d 152, 157 (7th Cir.1993) ("[A] bankruptcy court is simply not authorized to do whatever is necessary to reach an equitable result; it may only do whatever is necessary to enforce the Code. . . ."); *In re Lapiana*, 909 F.2d 221, 223–224 (7th Cir.1990) ("[B]ankruptcy, despite its equity pedigree, is a procedure for enforcing prebankruptcy entitlements under specified terms and conditions rather than a flight of redistributive fancy. . . . We deprecate flaccid invocations of 'equity' in bankruptcy proceedings.").

15. Because the Court has determined that American is entitled to an administrative claim for the services it provided to Midway, albeit in an undetermined and unliquidated total amount, this affirmative defense is moot and will not be further discussed.

**C. Whether Monies Owed by American to Midway Should Be Offset Against Midway's Debt to American Based on the Doctrines of Recoupment and Setoff**

16. American contends that to the extent that the Court determines that American owes an amount to Midway, such amount should be offset against the Claims held by American based on the doctrines of recoupment and setoff.

**(i) Recoupment**

17. Recoupment is a nonbankruptcy common law doctrine established through precedent which is not codified in the Bankruptcy Code. *A and C Elec. Co., Inc. v. Meade Elec. Co., Inc. (In re A and C Elec. Co., Inc.)*, 211 B.R. 268, 273 (Bankr.N.D.Ill.1997) (citation omitted).

18. The United States Supreme Court has recently observed that courts have permitted the use of recoupment in bankruptcy cases. *Reiter v. Cooper*, 507 U.S. 258, 265 n. 2, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993).

19. A recoupment is the netting of adverse claims which arise out of the same transaction. *See In re Peterson Distrib., Inc.*, 82 F.3d 956, 959 (10th Cir.1996); *In B & L Oil Co.*, 782 F.2d 155, 157 (10th Cir.

462

1986); *Lee v. Schweiker,* 739 F.2d 870, 875 (3d Cir.1984); *In re Stoecker,* 131 B.R. 979, 982–983 (Bankr.N.D.Ill.1991).

20. Recoupment is based upon the premise that one party should be entitled to show that it is not liable for the full amount of the other party's claims because of matters arising out of the same transaction. *Newbery Corp. v. Fireman's Fund Ins. Co.,* 95 F.3d 1392, 1399–1400 (9th Cir.1996); *St. Francis Physician Network, Inc. v. Rush Prudential HMO, Inc. (In re St. Francis Physician Network, Inc.),* 213 B.R. 710, 716 (Bankr.N.D.Ill.1997).

21. "The justification for the recoupment doctrine is that where the creditor's claim against the debtor arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation, and application of the limitations on set-off in bankruptcy would be inequitable." *Steinberg v. Illinois Dept. of Mental Health and Dev. Disabilities (In re Klingberg Schools),* 68 B.R. 173, 178 (N.D.Ill.1986), *aff'd,* 837 F.2d 763 (7th Cir.1988) (citation omitted).

22. Recoupment is different from setoff because recoupment requires that the same transaction be involved in the debts. The key difference between recoupment and setoff is that a setoff may (although it does not necessarily) involve different transactions, but the essential element of recoupment is that it is a demand arising from the same transaction as the debtor's claim. *St. Francis Physician Network,* 213 B.R. at 716.

23. There are two limitations on the doctrine of recoupment. First, the claims must arise from a single contract or transaction. *In re American Sunlake Ltd. Partnership,* 109 B.R. 727, 730 (Bankr. W.D.Mich.1989). Second, there must be some type of "overpayment" whether accidentally made or contractually made. *Id.; In re Public Service Co. of New Hampshire,* 107 B.R. 441, 445 (Bankr.D.N.H.1989).

**(ii)** *Setoff*

24. The Court incorporates by reference its conclusions of law in paragraphs 2 through 7 under Count II.

25. The Court is unable to determine at this time whether American owes money to Midway, and thus cannot determine if an amount should be offset against Midway's debt to American based on the doctrine of setoff.

26. Inasmuch as multiple transactions are involved regarding the interline services provided between Midway and American, recoupment is inapplicable and inapposite. Thus, this defense is therefore denied.

**D.** *Whether American is an Assignee of the Midway Passengers' Claims and if the Bilateral Agreement Does Not Govern its Claims, Whether American's Claims are Entitled to the Same Priority as Those of the Midway Passengers*

27. American argues that because it provided transportation to Midway's passengers, it is an assignee of the Midway passengers' claims. American asserts that in the event the Bilateral Agreement does not govern its Claims, its Claims are entitled to the same priority as those of the Midway passengers.

28. American's argument is not developed in its post-trial submissions nor supported by appropriate references to the trial record and pertinent legal authorities. Accordingly, the Court denies this unsupported defense. *See LINC Finance,* 129 F.3d at 921; *Pelfresne,* 917 F.2d at 1023.

29. The Court has no duty to research and construct legal arguments available to a party. *Head Start Family,* 46 F.3d at 635.

***MOTION OF AMERICAN TO STRIKE PORTIONS OF EXHIBIT A TO THE TRUSTEE'S POST–TRIAL MEMORANDUM AND ALL REFERENCES THERETO IN ITS POST–TRIAL SUBMISSIONS***

1. American seeks to strike portions of Exhibit A to the Trustee's post-trial

memorandum and all references thereto in its post-trial submissions. Exhibit A to the post-trial memorandum consists of copies of a batch of 200 airline tickets for the month of November, 1991. American does not object to the actual tickets, which are part of the record. Rather, American objects to the Trustee's attempt to contest American's Claims based on an analysis of documents which was never made part of the record at trial.

2. Specifically, American objects to the handwritten calculations that appear to be the work product of the Trustee's counsel or staff, and was prepared in connection with the trial. These calculations were never identified on the Trustee's exhibit list; were never authenticated by any witness; and were never offered or admitted into evidence.

3. In addition, American objects to the admission of highlighted portions of the tickets in Exhibit A. The Trustee argues that the Court can conclude that 54 tickets were overpriced by comparing the sticker in the right hand corner to the sticker in the lower left corner. Again, American objects on the basis that the Trustee failed to present a witness to testify that those 54 tickets were improperly billed. Moreover, American contends that the tickets themselves do not demonstrate on their face that they are improperly billed.

4. The Trustee responds that highlighting portions of the tickets which are in evidence to show the difference between total ticket value and sticker price is nothing more than fair comment about evidence. The Trustee argues that the evidentiary basis for that is Mark Zeko's explanation of how to read a ticket so that Midway's coupon value could be compared to American's Barbados-generated sticker price. See [9/9/97 Tr. at 147:2–154:25 (Zeko) ]. Neither party cites any case law in support of their respective positions.

5. The Court hereby grants the motion in part. The Court will not consider any of the handwritten calculations which were not offered nor admitted into evidence. The Court finds those handwritten calculations wholly unsupported with credible foundation testimony serving as the proper vehicle for admission into evidence of those calculations.

Accordingly, the Court will not consider those handwritten notations. As for the highlighted portions of the tickets, the Court will not strike those portions. Rather, the Court will attach no significance to the highlighting. Whether the Court will ultimately conclude that those 54 tickets were improperly billed remains to be seen. The Court cannot, without proper testimony, determine on the face of the tickets, which, if any, of the tickets were improperly billed. Moreover, American was not given the opportunity to cross-examine a witness with respect to these highlighted portions of the tickets.

6. Nevertheless, the Trustee's highlighted portions of these tickets to help aid the Court in its determination does not warrant striking those portions of the tickets. Both parties were free to argue in their post-trial submissions the significance of those differing figures. That the Trustee offered no evidentiary or testimonial evidence to support his conclusion that those 54 tickets constitute examples of over billing certainly cuts against that supposition.

### CONCLUSION

The Court holds that American demonstrated that its Claims are entitled to administrative priority status under 11 U.S.C. §§ 503(b)(1)(A) and 507(a)(1). With respect to the passenger transportation services component of its Claims, however, American has failed to meet its burden of proof on the precise and correct amount which the Court should allow, inasmuch as neither party has completely reviewed and audited the thousands of flight coupons and related documents underlying such component, and the Court is in no position to do so. Hence, the Court sustains the Trustee's objections in this regard.

The Court further holds that the non-transportation services and ground handling services Claims in the amount of $337,910.97 and $58,677.37 respectively are entitled to administrative priority status under §§ 503(b)(1)(A) and 507(a)(1). Additionally, the Court holds that the Universal Air Travel Plan chargeback component of American's Claims in the sum of $26,098.82 is entitled to

administrative priority status under §§ 503(b)(1)(A) and 507(a)(1). The Court overrules the Trustee's objections to these components of the Claims.

The Court holds that Count II of the Complaint is time barred under 11 U.S.C. § 546(a) and sustains American's affirmative defense in this respect.

Pursuant to Count III of the Complaint, the Court holds that the Trustee failed to support his claim by a preponderance of the evidence that American breached the Bilateral Agreement by submitting improperly billed invoices for the period April 1, 1991 through November 13, 1991.

With respect to Count IV of the Complaint, the Court holds that the Trustee has not adequately demonstrated the necessity for an accounting of the interline charges and credits between Midway and American. The Court exercises its discretion by not ordering a full and complete accounting in light of the disposition ordered under Count I.

Trustee requests in Count V of the Complaint that American turn over the sum of $835,000.00 under 11 U.S.C. § 542 as the result of monies American received for which it is not entitled to receive administrative priority. The Court reserves ruling on this matter pending the disposition ordered in Count I.

The Court sustains American's first affirmative defense, in part, and holds that Count II of the Complaint is barred under 11 U.S.C. § 546. The Court denies this affirmative defense as to the other Counts. In addition, the Court denies the defense that the Trustee's objections are barred by the doctrines of waiver and estoppel. The Court holds that Count V of the Complaint, which seeks turnover of property of Midway's Estate, is not barred under the doctrine of laches.

Moreover, the Court holds that American's affirmative defense to allow the Midway Estate to retain the benefit of the services without compensation to American would be unjust and inequitable is moot insofar as the Court has determined that American's Claims are entitled to administrative priority status, albeit in an undetermined and unproven total sum.

Additionally, the Court is unable to determine at this time whether American owes monies to Midway, and thus cannot determine if an amount should be offset against Midway's debt to American based on the doctrine of setoff. The doctrine of recoupment is inapplicable, and thus this affirmative defense is denied.

Furthermore, American's last affirmative defense regarding its Claims being entitled to the same priority as those of the Midway passengers in the event the Bilateral Agreement does not govern, is denied as unsupported.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.